617 S.E.2d 801

**NAPOLEON S. and Linda S., Plaintiffs Below, Appellants,**

v.

**Martha Yeager WALKER, Secretary of West Virginia Department of Health and Human Resources, Defendant Below, Appellee.**

No. 32046.

Supreme Court of Appeals of West Virginia.

Submitted: April 6, 2005.

Filed: June 10, 2005.

---

George F. Fordham, Clarksburg, for the Appellants.

Darrell V. McGraw, Jr., Attorney General, Rocco S. Fucillo, Assistant Attorney General, Charleston, for the Appellee.

Chief Justice ALBRIGHT delivered the Opinion of the Court.

Justice MAYNARD dissents and reserves the right to file a dissenting opinion.

Justice STARCHER concurs and reserves the right to file a concurring opinion.

ALBRIGHT, Chief Justice.

This is an appeal by Napoleon and Linda S. (hereinafter "Appellants")[1] from an order of the Circuit Court of Kanawha County affirming a decision of the West Virginia Department of Health and Human Resources Board of Review (hereinafter "DHHR") determining that the Appellants could not become the adoptive parents of their grandson, Tyler S. The Appellants contend that the lower court erred in failing to apply a statutory and DHHR policy preference for grandparent adoption. Based upon a thorough review of the record, briefs, and applicable precedent, this Court finds that the lower court abused its discretion in affirming the DHHR decision refusing to permit the Appellants to adopt Tyler S. We therefore reverse and remand for entry of an order requiring that Tyler be placed with the Appellants for adoption, with the additional conditions specified below.

I. Factual and Procedural History

On December 27, 2000, at the age of two months,[2] Tyler S. suffered a spiral fracture of the left femur and over twenty bruises on his body. He was placed in foster care on January 1, 2001, upon discharge from the hospital, due to the serious injuries which were later determined to have been inflicted upon him by his biological parents, Ryan and Nicole S. In April 2001, the parental rights of the biological parents were terminated by the Circuit Court of Harrison County based upon this abuse. The Circuit Court of Harrison County found that Ryan S. had inflicted the spiral fracture to Tyler's left femur due to Ryan's frustration with Tyler while trying to give Tyler a bath. At the time of termination of parental rights, the CASA representative, Ms. Jeanne Pote, recommended that Tyler be placed for adoption with the Appellants, parents of Ryan S. and paternal grandparents of Tyler.[3] The Circuit Court of Harrison County did not address Ms. Pote's recommendation in the termination order.

Prior to the termination of parental rights, the Appellants had notified the DHHR of their desire to adopt Tyler. A social assessment and home study of the Appellants' home in Florida was completed on May 16, 2001, by the Florida Department of Children and Families. The home study concluded that the Appellants could provide a safe and loving home, despite their difficulty accepting the fact that their son would have intentionally harmed Tyler.[4] The Florida home study determined that such opinions would not interfere with the Appellants' ability to provide proper care and protection to Tyler.

The adoption review committee thereafter requested psychological evaluations of the Appellants. These evaluations were conducted on January 21, 2002, by Dr. William Fremouw, a licensed psychologist. His report was favorable toward both Appellants and included observations that they would protect their grandson and would not allow Tyler to be alone with his biological father, Ryan. Specifically, Dr. Fremouw concluded that "[w]hile she [Appellant Linda S.] does not believe that her son physically abused her grandson, she is willing to accept the requirement that he have no direct contact

---

**1.** As is our practice in cases involving sensitive matters, we use initials to identify the parties' last names. *See In re Scottie D.*, 185 W.Va. 191, 406 S.E.2d 214 (1991).

**2.** Tyler was born on October 23, 2000. He is currently four years of age.

**3.** In her report, Ms. Pote noted that the Appellants had been "very supportive" and had "made numerous trips" to visit Tyler. Somewhat ironically, Ms. Pote later changed her opinion and became convinced through her involvement with the adoption review committee that the Appel-

lants were not an appropriate placement for Tyler.

**4.** The home study report explained as follows regarding the Appellants:

[They] report that they love their own son very much and will not turn their back on him, but are very serious about protecting Tyler and would never let anything happen to him. They report that they do not believe that their son would intentionally hurt Tyler, but that they would abide by any court orders that they need to.

with Tyler if she were to adopt him." The report also indicated that Ryan lives approximately 1,000 miles from his parents and would not be expected to be a frequent visitor.

By letter dated February 25, 2002, the Appellants were notified by the DHHR that they had not been selected for the permanent placement of Tyler. The adoption review committee had determined that the best interests of Tyler would not be served by placing him with the Appellants since the Appellants had failed to acknowledge their son's involvement in inflicting injuries upon Tyler. The guardian ad litem, Ms. Meredith McCarthy, stated the her main concern was Tyler's protection and that the Appellants had continually refused to accept the fact that their son inflicted Tyler's injuries.

The Appellants requested a review of the decision of the DHHR, and an initial grievance hearing was held on July 10, 2002. The original decision was upheld, and the Appellants appealed to the Board of Review of the DHHR. On August 30, 2002, the Chairman of the Board of Review notified the Appellants that their appeal had been denied.

The Appellants appealed to the Circuit Court of Kanawha County, and a hearing was held on November 15, 2002. On February 9, 2004, the lower court entered an order affirming the DHHR decision. The lower court observed that "[b]ecause of the rulings made by the Circuit Court of Harrison County during the pendency of the abuse and neglect hearings, and further because of the distance they must travel from their home in Florida to West Virginia, the [Appellants] have had very little physical contact or opportunity to bond with Tyler since his birth." The Circuit Court of Kanawha County addressed the Appellants' allegations that the grandparent preference had not been properly applied but ultimately found that the DHHR and adoption review committee had not erred in finding that the best interests of the child would not be served by placing him with the Appellants. The court noted that "[t]his decision was based upon significant concerns that Petitioners could not ensure the safety of the child and the lack of a bond between Petitioners and their grandson." The Appellants appealed to this Court.

The Appellants' affidavits stated that the Appellants were aware that their son, Ryan, "admitted to the Circuit Court of Harrison County at the underlying abuse and neglect hearing that he was responsible for the injury or injuries caused to his son Tyler and that this admission was made under oath." The Appellants also stated: "That I accept our son's admission of responsibility for all of Tyler's injury or injuries." The Appellants each further explain:

That in the event my spouse and I are given the opportunity to adopt and do adopt our grandson, Tyler, I would, under no circumstances whatsoever, allow any contact, direct or indirect, between Ryan and our adopted son, Tyler. Further, I would make certain that our son Ryan was aware that I would permit no contact.

With regard to any attempts by Ryan to contact Tyler, the Appellants both assert as follows:

That in the event, that our son Ryan would approach us when Tyler was with either one of us at or outside our home, or if he would contact or attempt to contact Tyler when he was at school or some other activity when I was not present, that I would immediately contact law enforcement authorities and advise them of the situation and request whatever action that would be necessary to protect Tyler and keep Ryan away from him. Further, I would apply to the court for an injunction or protective order to be served against Ryan and do everything in my power to see that the injunction or protective order was fully enforced.

## II. Standard of Review

"This Court reviews the circuit court's final order and ultimate disposition under an abuse of discretion standard. We review challenges to findings of fact under a clearly erroneous standard; conclusions of law are reviewed de novo." Syl. Pt. 4, Burgess v. Porterfield, 196 W.Va. 178, 469 S.E.2d 114 (1996).

## III. Discussion

The guidance for consideration of this matter is primarily provided by statute and a

DHHR policy reflecting the intent of the statute. West Virginia Code § 49–3–1(a) .(2001) (Repl.Vol.2004) provides, in pertinent part, as follows:

(a)(1) Whenever a child welfare agency licensed to place children for adoption or the department of health and human resources has been given the permanent legal and physical custody of any child and the rights of the mother and the rights of the legal, determined, putative, outside or unknown father of the child have been terminated by order of a court of competent jurisdiction or by a legally executed relinquishment of parental rights, the child welfare agency or the department may consent to the adoption of the child pursuant to the provisions of article twenty-two [§§ 48–22–101 et seq.], chapter forty-eight of this code.

(2) Relinquishment for an adoption to an agency or to the department is required of the same persons whose consent or relinquishment is required under the provisions of section three hundred one [§ 48–22–301], article twenty-two, chapter forty-eight of this code. The form of any relinquishment so required shall conform as nearly as practicable to the requirements established in section three hundred three [§ 48–22–303], article twenty-two, chapter forty-eight, and all other provisions of that article providing for relinquishment for adoption shall govern the proceedings herein.

(3) For purposes of any placement of a child for adoption by the department, *the department shall first consider the suitability and willingness of any known grandparent or grandparents to adopt the child.* Once any such grandparents who are interested in adopting the child have been identified, the department shall conduct a home study evaluation, including home visits and individual interviews by a licensed social worker. *If the department determines, based on the home study evaluation, that the grandparents would be suitable adoptive parents,* it shall assure that the grandparents are offered the placement of the child prior to the consid-

eration of any other prospective adoptive parents.

W. Va.Code § 49–3–1(a) (emphasis supplied).

The Adoption Services Manual utilized by the DHHR mirrors the design of that statute, providing as follows in pertinent part of Section 15510A: "If the home study indicates that the grandparents would be suitable adoptive parents then they must be offered the placement of the child prior to the consideration of any other prospective adoptive parents."

A. Best Interests Analysis

■■■ A fundamental mandate, recognized consistently by this Court, is that the ultimate determination of child placement must be premised upon an analysis of the best interests of the child. As this Court has repeatedly stated, "Although parents have substantial rights that must be protected, the primary goal in cases involving abuse and neglect, as in all family law matters, must be the health and welfare of the children." Syl. Pt. 3, *In re Katie S.*, 198 W.Va. 79, 479 S.E.2d 589 (1996). "[T]he best interests of the child is the polar star by which decisions must be made which affect children." *Michael K.T. v. Tina L.T.*, 182 W.Va. 399, 405, 387 S.E.2d 866, 872 (1989) (citation omitted).

West Virginia Code § 49–1–1(b) (1999) (Repl.Vol.2004) also addresses this best interests requirement, providing in pertinent part as follows:

In pursuit of these goals it is the intention of the Legislature to provide for removing the child from the custody of his or her parents only when the child's welfare or the safety and protection of the public cannot be adequately safeguarded without removal; and, when the child has to be removed from his or her family, to secure for the child custody, care and discipline consistent with the child's best interests and other goals herein set out. It is further the intention of the Legislature to require that any reunification, permanency or preplacement preventative services address the safety of the child.

This Court examined that statute in *State v. Michael M.*, 202 W.Va. 350, 504 S.E.2d 177 (1998), and explained as follows:

In order to effectuate the legislative intent expressed in *W.Va.Code § 49–1–1(a)*

[1997], a circuit court must endeavor to secure for a child who has been removed from his or her family a permanent placement with the level of custody, care, commitment, nurturing and discipline that is consistent with the child's best interests. 202 W.Va. at 358, 504 S.E.2d at 185.

■ This Court has not had the opportunity to address the interplay between the statute affording grandparents a preference for the placement of a child such as Tyler and the overriding standard of the best interests of the child. In *In re Carol B.*, 209 W.Va. 658, 550 S.E.2d 636 (2001), however, this Court encountered a similar issue regarding sibling placement. In that case, this Court specified that the best interests analysis is to be addressed in conjunction with the statutory preference for placement of a child with his or her siblings. This Court explained as follows at syllabus point four of *Carol B.*:

> W.Va.Code § 49–2–14(e) (1995) provides for a "sibling preference" wherein the West Virginia Department of Health and Human Resources is to place a child who is in the department's custody with the foster or adoptive parent(s) of the child's sibling or siblings, where the foster or adoptive parents seek the care and custody of the child, and the department determines (1) the fitness of the persons seeking to enter into a foster care or adoption arrangement which would unite or reunite the siblings, *and* (2) placement of the child with his or her siblings is in the best interests of the children. In any proceeding brought by the department to maintain separation of siblings, such separation may be ordered only if the circuit court determines that clear and convincing evidence supports the department's determination. Upon review by the circuit court of the department's determination to unite a child with his or her siblings, such determination shall be disregarded *only* where the circuit court finds, by clear and convincing evidence, that the persons with whom the department seeks to place the child are unfit *or* that placement of the child with his or her siblings is not in the best interests of one or all of the children.

We also explained in *Carol B.* that "[w]e believe that both sibling preference and best interests of the child considerations are incorporated in W.Va.Code § 49–2–14(e). In order to determine how these considerations interact, we look to the clear provisions of the statute." 209 W.Va. at 665, 550 S.E.2d at 643. In *Carol B.*, this Court found that the statute at issue therein provided guidance, and this Court concluded as follows:

> [B]ecause the statute provides that, the circuit court is not to order separation, when recommended by the DHHR, in the absence of clear and convincing evidence supporting the DHHR's determination, we believe that it follows that the circuit court is not to disregard the DHHR's recommendation that siblings should be united, unless it finds that clear and convincing evidence indicates to the contrary.

209 W.Va. at 665–66, 550 S.E.2d at 643–44.

Other jurisdictions have struggled with the manner in which relative preference should be implemented in conjunction with the best interests of the child analysis. Under the Minnesota framework for this type of examination, the preference for placement with relatives may be overcome only where the best interests of the child will be jeopardized by placement with relatives. Findings regarding the best interests of the child may support a decision to place the children with the unrelated individuals "if those findings establish either the detriment or good cause necessary to defeat the relative preference." *In re Adoption of C.H.*, 548 N.W.2d 292, 298 (Minn.App.1996). Thus, the preference typically mandates that adoptive placement with relatives is presumptively in a child's best interests, absent a showing of detriment to the child or other good cause to the contrary. *In re Welfare of D.L.*, 486 N.W.2d 375, 380 (Minn.1992), *cert. denied, Sharp v. Hennepin County Bureau of Social Services*, 506 U.S. 1000, 113 S.Ct. 603, 121 L.Ed.2d 539. Courts have been swift to emphasize that the existence of a preference does not translate into a perfunctory grant of custody. In *Welfare of D.L.*, for instance, the Supreme Court of Minnesota explained:

> Our holding does not mean that relatives' adoption petitions must be granted automatically. The terms "best interests," "good cause to the contrary" and "detriment" do not lend themselves to standardized definitions. The best interests of po-

tential adoptees will vary from case to case, and the trial court retains broad discretion because of its opportunity to observe the parties and hear the witnesses. *Id.* (citation omitted).

■ In the present case, the governing statute, West Virginia Code § 49-3-1(a), provides guidance on the standard to be employed regarding grandparent preference. As quoted above, the statute provides that the DHHR "shall" offer placement to the grandparents "[i]f the department determines, based on the home study evaluation, that the grandparents would be suitable adoptive parents." W. Va.Code § 49-3-1(a)(3). Thus, in the view of this Court, West Virginia Code § 49-3-1(a) provides for grandparent preference in determining adoptive placement for a child where parental rights have been terminated and also incorporates a best interests analysis within that determination by including the requirement that the DHHR find that the grandparents would be suitable adoptive parents prior to granting custody to the grandparents. The statute contemplates that placement with grandparents is presumptively in the best interests of the child, and the preference for grandparent placement may be overcome only where the record reviewed in its entirety establishes that such placement is not in the best interests of the child. By specifying in West Virginia Code § 49-3-1(a)(3) that the home study must show that the grandparents "would be suitable adoptive parents," the Legislature has implicitly included the requirement for an analysis by the DHHR and circuit courts of the best interests of the child, given all circumstances of the case.

### B. Significance of Statutory Grandparent Preference

The concept of placement with relatives, where appropriate, has long been included in the jurisprudence of this and other states. The Legislature of this state has clearly expressed a preference for placement with grandparents, and the policies of the DHHR properly reflect that intention.

■ In this Court's evaluation of the matter presently before us, we note that the DHHR initially discouraged permanency planning focused upon grandparent placement due to the perceived potential for family reunification. When such reunification became impossible, however, the DHHR provided only limited assistance to the grandparents, either maternal or paternal, in developing a plan for adoption of Tyler. Moreover, despite a positive home study and a favorable psychological evaluation, the adoption review committee chose to place Tyler with his foster parents rather than his paternal grandparents, the Appellants. While several participants in the review committee indicated that they had not been convinced, through the home study and psychological report, that the Appellants would adequately protect Tyler, the committee failed to request additional information or evaluation regarding those areas of concern. The members asserted only their trepidation concerning the Appellants' willingness to prevent Tyler from being exclusively in the presence of his father, Ryan. Thus, while perceived deficiencies in the home study and psychological evaluations were claimed, the committee failed to address those issues or attempt, in any meaningful manner, to rectify them. The grandparent preference articulated in West Virginia Code § 49-3-1(a) must be recognized as essential guidance in the determination of child placement. The DHHR failed to observe the directives of that preference or apply it in an appropriate manner in this case.[5]

---

5. According to a July 31, 2002, letter written by Thomas Arnett, State Hearing Officer for the DHHR, the guardian ad litem, Ms. McCarthy, had explained during the grievance hearing that protection of Tyler was her primary concern in not selecting the Appellants to be Tyler's adoptive parents. She had apparently not personally interviewed the Appellants. This Court emphasized the need for guardians ad litem to conduct a "full and independent investigation" in syllabus point five of *In Re Jeffrey R.L.*, 190 W.Va. 24, 435 S.E.2d 162 (1993), explaining as follows:

Each child in an abuse and neglect case is entitled to effective representation of counsel. To further that goal, *W.Va.Code*, 49-6-2(a) [1992] mandates that a child has a right to be represented by counsel in every stage of abuse and neglect proceedings. Furthermore, Rule XIII of the *West Virginia Rules for Trial Courts of Record* provides that a guardian *ad litem* shall make a full and independent investigation

While this Court appreciates the heightened level of scrutiny employed by the committee in this case of extreme abuse and tender age, the evidence furnished concerning the Appellants, through the home study and psychological examinations, does not appear to provide a rational basis for the expressed fears of the committee. The Appellants specifically articulated their earnest commitment to the protection of their grandson Tyler. This was communicated not only by the Appellants themselves but was also the expressed view of the psychologist who interviewed and evaluated the Appellants, with specific emphasis upon the need for protection of young Tyler. In his evaluation of Appellant Mrs. Linda S., Dr. Fremouw found that she was emotionally stable and would follow the directives of the court regarding the limitations of contact between Tyler and his biological father. Additionally, Dr. Fremouw found that Appellant Mr. Napoleon S. "was clear that if he had custody of Tyler, Ryan would not be allowed to be alone with him." Dr. Fremouw concluded, "Overall, Mr. [S.] appears clear and committed to not let Ryan have direct contact with Tyler without supervision." Further, Dr. Fremouw found that Mr. S. was "aware of the requirement that Ryan have no contact with Tyler and would enforce that." Both Appellants were also evaluated through the use of MMPI testing,[6] indicating that the Appellants were not distorting their responses to minimize or maximize problems.

While the lower tribunals did not have the benefit of the specific statements made by the Appellants in the affidavits submitted in this Court, such affidavits, as quoted above, support the ultimate conclusion that Tyler's best interests will be served and that he will be competently protected by placement with the Appellants.

### C. Tyler's Bonding With Grandparents

In the underlying abuse and neglect case, the Circuit Court of Harrison County granted intervenor status to both maternal and paternal grandparents on November 14, 2001. According to the record, all grandparents exercised visitation privileges with Tyler until the Circuit Court of Harrison County terminated visitation between the grandparents and Tyler on May 31, 2002. The record reflects that the absence or limitation of bonding was asserted as one factor relevant in the determination that Tyler should not be placed with the Appellants. It is unreasonable to contend that the absence of bonding should be a legitimate basis for denying the grandparents an opportunity to adopt when the court system itself eliminated any potential for bonding when it terminated visitation rights on May 31, 2002, months prior to the first grievance hearing and almost two years prior to the lower court order from which the Appellants now appeal. Given Tyler's young age, we believe that it is likely that he will bond easily with his grandparents in a relatively short period of time.

### IV. Conclusion

Based upon this Court's analysis of this case, we find that the lower court abused its discretion in affirming the conclusion of the review committee and DHHR and erred in failing to permit the Appellants to adopt Tyler S. We consequently remand for the entry of an order requiring that Tyler be placed with the Appellants for adoption. We further direct the lower court to fashion an order which explicitly prohibits contact between Tyler and Ryan, in accord with the

of the facts involved in the proceeding, and shall make his or her recommendations known to the court. Rules 1.1 and 1.3 of the *West Virginia Rules of Professional Conduct,* respectively, require an attorney to provide competent representation to a client, and to act with reasonable diligence and promptness in representing a client. The Guidelines for Guardians *Ad Litem* in Abuse and Neglect cases, which are adopted in this opinion and attached as Appendix A, are in harmony with the applicable provisions of the *West Virginia Code,* the *West Virginia Rules for Trial Courts of Record,* and the *West Virginia Rules of Professional Conduct,* and provide attorneys who serve as

guardians *ad litem* with direction as to their duties in representing the best interests of the children for whom they are appointed.

Elaborating upon the *Jeffrey* requirements in *Carol B.,* this Court specified that "A full and independent investigation includes interviewing all prospective parents when a child's placement is at issue." 209 W.Va. at 668 n. 6, 550 S.E.2d at 646 n. 6.

**6.** MMPI is an acronym for Minnesota Multiphasic Personality Inventory. It is a frequently utilized clinical testing mechanism typically employed to provide personality information and to assess psychological adjustment factors.

representations of the Appellants in their affidavits filed with this Court.

■ We further find that a gradual transition period for Tyler would be preferable to an immediate custody change. We have previously encouraged such gradual changes in the custody of children. For example, in *Honaker v. Burnside*, 182 W.Va. 448, 388 S.E.2d 322 (1989), a gradual, six-month transition. of custody was approved. 182 W.Va. at 450, 388 S.E.2d at 324. Similarly, in *James M. v. Maynard*, 185 W.Va. 648, 408 S.E.2d 400 (1991), this Court required the circuit court to establish a plan for a gradual shift of custody. In syllabus point three of *James M.*, this Court held as follows:

> It is a traumatic experience for children to undergo sudden and dramatic changes in their permanent custodians. Lower courts in cases such as these should provide, whenever possible, for a gradual transition period, especially where young children are involved. Further, such gradual transition periods should be developed in a manner intended to foster the emotional adjustment of the children to this change and to maintain as much stability as possible in their lives.

Thus, upon remand in this case, the lower court should craft a plan for the gradual transition of custody of Tyler. Given the Appellants' intention to reside permanently in Florida, we believe that the transition period should be as short as is practicable, but long enough to assuage reasonable concerns that would arise from an abrupt change of custody and permit the restarting of the bonding process with the Appellants. We respectfully suggest that Appellants should take up temporary residence here in West Virginia during the transition period.

Reversed and Remanded with Directions.

MAYNARD, Justice, dissenting.

By reversing the decisions of the adoption review committee, the DHHR hearing officer, and the Circuit Court of Kanawha County, and by requiring that Tyler be placed with his paternal grandparents for adoption, the majority has unintentionally disregarded Tyler's best interests by placing him back in dangerous and life-threatening circumstances.

Two-month-old Tyler was viciously beaten and injured by his biological father, Ryan S. Specifically, Tyler suffered a broken leg (spiral fracture of the left femur) and more than twenty bruises on his body. At two months of age! It was found by the Circuit Court of Harrison County that Ryan S. inflicted the spiral fracture to Tyler's left femur after becoming frustrated with Tyler while attempting to give him a bath. Ryan and Nicole S.'s parental rights were rightly terminated because all would agree that Tyler's future safety depends upon his having absolutely no contact with Ryan S.

Yet, the majority now places Tyler back into a situation where he again could easily have contact with his abuser. I truly believe that this child is in harm's way and his personal safety is at great risk. The record is crystal clear that Appellants simply do not believe that their son, Ryan S., injured Tyler. This is indicated by the findings of both the Florida home study and Dr. Fremouw. For this very reason, the adoption review committee, made up of DHHR officials, Tyler's guardian ad litem, and a CASA representative, concluded that it was not in Tyler's best interests to be adopted by Appellants because Appellants could not ensure Tyler a safe home.

Also troublesome is the fact that the majority's decision is based, at least in part, on affidavits submitted by Appellants to this Court on appeal. Astonishingly, the affidavits were filed *after* oral argument in this case and after being solicited by one or more Justices of this Court. To solicit the affidavits during oral argument; to permit them to be filed post-argument without any stipulation from the opposing party[1] (talk about

---

1. This Court has stated,
   [T]he law is clear in West Virginia that an appellate exhibit has no evidentiary value on appeal unless it was introduced in the circuit court or it is subject to judicial notice under Rule 201 of the West Virginia Rules of Evidence. Our rule remains steadfast that the record may not be enhanced or broadened on

appeal except by the methods discussed or by the stipulation of the parties. *See O'Neal v. Peake Operating Co.*, 185 W.Va. 28, 404 S.E.2d 420 (1991) (this Court may only consider matters appearing in the trial record).
*Powderidge Unit Owners v. Highland Prop.*, 196 W.Va. 692, 703 n. 16, 474 S.E.2d 872, 883 n. 16 (1996).

trial by ambush!); to consider them; and to rely on them in deciding this case is a fugitive procedure unknown to our law, one that outrageously violates our rules of evidence and appellate procedure, and one that is grossly unfair to the losing litigants. This is third-world justice and no other Supreme Court in the United States would allow such a brutally unjust procedure. However, even if these affidavits were properly submitted, it is clear to me, and it should be clear to the majority, that they have absolutely no evidentiary value.

Appellants' sudden change in thinking is too little too late. Below, Appellants were always consistent and adamant in their conviction that their son could not have intentionally injured Tyler. This firm conviction softened only after Appellants lost before the hearing examiner and the circuit court whose decisions were based, in part, on Appellant's refusal to accept their son's actions. Further, their change in thinking can only be described as lukewarm. They now "accept our son's admission of responsibility for all of Tyler's injury or injuries." Notably, they do not accept that their son is responsible for Tyler's injuries, but only that he has admitted that he is responsible. It does not take a genius to see what is going on here. Appellants simply are saying what they think this Court wants to hear in order to get what they want.

In light of the fact that Appellants do not really accept the fact that their son viciously injured their two-month-old grandson, once Appellants adopt Tyler, what possible reason do they have for keeping their son away from Tyler? Without a doubt, due to the majority opinion, Tyler *will* have continued contact with Ryan S., the man who fractured his left femur and battered his body with bruises merely because Tyler was a little too rambunctious in the bathtub.

It is simply reckless to accept Appellants' affidavits at face value. By placing Tyler in a position where he can easily and will likely come into contact with his abuser, the majority has unintentionally placed Tyler in a dangerous situation and ignored his best interests. Infants and children who have been physically abused, had bones broken and are bruised all over should never be placed in a home where there is any reasonable chance

that the same abuser will have another opportunity to beat and maim them.

Finally, in light of my grave fear of the imminent danger and grievous bodily harm or death of this child, and because the West Virginia DHHR cannot monitor this child's welfare in Florida, I intend to send a copy of this dissenting opinion to the West Virginia DHHR and have it serve as a formal request that it contact the analogous Florida agency and request and encourage that agency to open a case file on Tyler. Hopefully the Florida agency will monitor the home to ensure that Tyler has absolutely no contact with his abuser. I realize that this is extremely unusual, but I believe that the circumstances demand it.

For the reasons set forth above, I dissent.

STARCHER, J., concurring.

I concur with the majority opinion in this case and write separately only to emphasize that four of the five members of this Court, based upon the entire record, have determined that adoptive placement with Tyler's paternal grandparents is in Tyler's best interests. The single dissenter has questioned the credibility of the grandparents with regard to their willingness to protect Tyler from his biological father. A comprehensive review of the record, however, discloses the grandparents' uncompromising commitment to Tyler and his safety. It is evident that the grandparents have maintained a vigorous effort to adopt Tyler and have repeatedly asserted their dedication to his security and well-being. While these individuals may have initially found it extremely difficult to accept the well-documented fact that their son committed a heinous act of child abuse upon Tyler, their commitment to Tyler's safety has been unfaltering, and they have consistently maintained that they will adhere to the requirements of any order regarding contact between their son and Tyler. The majority opinion firmly states that the lower court is directed to fashion an order which explicitly prohibits contact between Tyler and his biological father.

The single dissenter also suggests that reliance upon the post-argument affidavits was inappropriate. While the acceptance of

such affidavits is a practice rarely employed by this Court, we have permitted post-argument affidavits in exceptional circumstances. In this case, the potential for grandparent adoption had not been favored by the DHHR, and questions had been raised regarding the willingness of the grandparents to permit contact between their son and Tyler. Because this was a pivotal and dispositive issue in this case, affidavits regarding the grandparents' intent provided additional explanation of assistance to this Court in ascertaining the resolution which most effectively promoted Tyler's best interests. The affidavits, in fact, only reiterated the commitments the grandparents had previously articulated.

As the majority opinion noted, for instance, the home study report contained in the record explained that the grandparents are "very serious about protecting Tyler and would never let anything happen to him." Further, the home study stated that the grandparents "would abide by any court orders that they need to." Additionally, the underlying record revealed, as the majority noted, that psychological evaluations indicated that the grandparents were willing to accept the requirement that Tyler could have no contact with his biological father.

Thus, while the affidavits provided further explanation of the grandparents' intent, the position asserted by the grandparents in the affidavits with regard to the protection of Tyler was not inconsistent with the position previously asserted and fully evidenced in the record.

Child placement and custody decisions, particularly subsequent to an appalling instance of child abuse, are fraught with emotional complication and are particularly frustrating because there are no certainties or guarantees. Tyler has experienced a very difficult start to life. By placing him with loving, committed grandparents, intent on protecting him from further harm, we have attempted to insure that Tyler's future will be bright. To that end, I concur with the majority opinion.