**No. 19-1089 - In re: J.P.**

**FILED**
**June 15, 2020**
released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

Hutchison, Justice, dissenting:

In this case, the majority has elevated the "rights" of the grandparent above the best interests of the child. For almost a hundred years, this Court has made clear that "[i]n a contest over the custody of an infant, the welfare of the child is the polar star by which the discretion of the court is to be guided." Syl., *State ex rel. Palmer v. Postlewaite*, 106 W.Va. 383, 145 S.E. 738 (1928). I am shocked and dismayed that the majority decided to cast aside this guiding principle when presented with undisputed evidence that removing this child from his foster parents would be "too harmful" and would create a "substantial risk" that he would develop reactive detachment disorder. Frustration with the DHHR because of the bureaucratic delays that resulted in the grandfather's home study not being completed for more than a year was no excuse for the majority to ignore what is in J.P.'s best interests. I do not wish to be a part of the tragedy that is going to befall this fragile child when he is ripped away from the only stable home he has ever known because of the majority's desire to punish the DHHR. Accordingly, I vehemently dissent from the majority's opinion.

Finding the grandfather's home study was delayed because of "the shortcomings of the DHHR,"[1] the majority focused on providing a fair outcome for the

---

[1] Slip op. at 14.

1

grandfather. Noting that the petitioner grandparents had immediately sought custody of their grandson upon his removal from his mother's home, the majority concluded that it simply "could not ignore this State's statutory preference carved out for grandparents." Slip op. at 20. While it is certainly unfortunate that the grandfather had to wait more than a year for his home study to be completed, it was not this Court's task to render a just result for him, even if the DHHR was responsible for the delay.[2] Rather, it was this Court's duty to determine whether the circuit court's placement decision was in the best interests of J.P. regardless of the grandparent preference.

This Court has long recognized that "the preference for grandparent placement may be overcome . . . where the record viewed in its entirety establishe[s] that such placement is not in the best interests of the child." Syl. Pt. 4, in part, *Napoleon S. v. Walker,* 217 W.Va. 254, 617 S.E.2d 801 (2005). More recently, this Court reiterated that the grandparent preference "is just that—a preference" and "emphasized[] the child's best interest remains paramount." *In re K.E.,* 240 W.Va. 220, 225, 809 S.E.2d 531, 536 (2018). Indeed,

> [b]y specifying in West Virginia Code § 49-3-1(a)(3) [now W. Va. Code § 49-4-114(a)(3)] that the home study must show that the grandparents 'would be suitable adoptive parents,' the Legislature has implicitly included the requirement for an analysis by the Department of Health and

---

[2] As a former circuit court judge, I am quite familiar with the ICPC process. While the record here suggests that the DHHR could have taken action to speed up the process, my own experiences tell me that invariably there will be a lengthy delay in the proceedings when an out-of-state home study must be completed. Even a phone call from a judge inquiring about the status of such a home study often goes unanswered.

Human Resources and circuit courts of the best interests of the child, given all circumstances of the case.

*Napoleon S.*, 217 W.Va. at 256, 617 S.E.2d at 803; syl. pt. 5. Accordingly,

regardless of whether there exists a placement preference that applies to the facts of th[e] case, any preference always is tempered by a consideration of the children's best interests. . . . In other words, if allegiance to a preferential placement does not promote the children's best interests, such preference must yield to the placement that is most beneficial to the children.

*In re K.L.* 241 W.Va. 546, 557, 826 S.E.2d 671, 682 (2019). Therefore,

adoption by a child's grandparents is permitted only if such adoptive placement serves the child's best interests. If, upon a thorough review of the entire record, the circuit court believes that a grandparental adoption is not in the subject child's best interests, it is not obligated to prefer the grandparents over another, alternative placement that does serve the child's best interests.

*In re Elizabeth F.*, 225 W.Va. 780, 787, 696 S.E.2d 296, 303 (2010).

In this case, the circuit court heard testimony from several witnesses, including an expert psychologist, Dr. James Behrmann, over the course of a three-day placement hearing and concluded that affording custody of J.P. to his grandfather was not in the child's best interests. By ignoring critical testimony provided by Dr. Behrmann and taking statements he made during the placement hearing out of context, the majority found that the circuit court erred when it ruled that it was in J.P.'s best interests to remain with his foster parents and be adopted by them. The majority reasoned that because Dr. Behrmann stated that both homes were "appropriate placements for the child," the grandparent preference dictated that the grandfather be granted custody of J.P. Unlike the

3

circuit court, however, the majority failed to comprehend crucial testimony from Dr. Behrmann regarding the effect that removing J.P. from the custody of his foster parents would have on his ability to form attachments with people in his life, including his grandparents.

During his testimony, Dr. Behrmann explained that

reactive detachment means I am never able to really connect deeply with someone. So my close relationships, my close friends, my marriages, my parenting of my own children becomes very difficult, becomes disruptive because I don't know, I'm not good at deep empathy and connecting[.]

. . . .

[W]ith good attachment we have a number of positive correlates such as grades in school, solid friendships, responsiveness to authority, good parenting as an adult, a number of things all match when you have good attachment. The outcomes from that are much superior.

Dr. Behrmann testified that J.P. had a "decent and growing" attachment to his foster parents, particularly his foster dad who had been a stay-at-home parent for J.P. since his placement with them. J.P.'s attachment to his grandfather was described by Dr. Behrmann to be "less than with the [foster parents.]" Critically, Dr. Behrmann testified that J.P was "at great risk" for reactive detachment disorder because of the different placements and "disruptions with his mom" during the first year of his life. He explained:

So [J.P.] is still much more focused on how you help him rather than just liking the relationship and enjoying being in it.

4

That's a real sign of risk of not attaching deeply. It's, again, across these parenting figures across time, situations, home, pool, visitation center, and also matches what I know about his early days, that disruption is not having a consistent organized, caring caretaker is predictive of attachment disorder. So his history matches that risk factor as well as matches what I saw.

Because of that it's very risky for him to have to form another attachment again. The more you do this at the later age the greater risk for not attaching. He's at the cusp of that.

Research shows that at two [years of age] your risk goes up substantially in terms of not deeply attaching if you haven't formed that already. At three [J.P.'s age at that time] your way at the outside end of the risks. The risk percentage goes up much more in study after study.

So psychologically from my perspective I think there's a real risk at this point of moving him again.

While Dr. Behrmann noted that he was not making a custody recommendation because he had not examined the parties' homes and had not spent a sufficient amount of time with them, he opined to a reasonable degree of certainty that "there is a substantial risk of [J.P.'s] inability to attach deeply if he's moved again from the place [the foster parents' home] he's attached." [3]

"[T]he primary goal in cases involving abuse and neglect . . . must be the health and welfare of the children." Syl. Pt. 3, in part, *In re Katie S.*, 198 W.Va. 79, 479

---

[3] Dr. Behrmann was only asked to complete a bonding assessment. He visited and observed J.P. with the foster parents in their home. He also observed J.P. visiting with his grandparents and cousins at a hotel pool. Notably, the grandfather's daughter (J.P.'s aunt) who lives in the grandfather's home and who will be one of J.P.'s primary caretakers when he is placed with them did not attend this visitation.

S.E.2d 589 (1996). J.P. has now spent more than half of his life with his foster parents who have provided the only secure and stable home J.P. has ever known. Because of the abuse he suffered during the first year of his life, J.P. is a very fragile child from a psychological perspective. There was undisputed evidence presented during the placement hearing that J.P. has a substantial risk of developing reactive detachment disorder if he is removed from his foster family. There was also undisputed evidence that J.P. has a growing attachment to his foster family. J.P.'s bond with his foster family was not only evident from Dr. Behrmann's testimony, but from that of J.P.'s foster father as well. In that regard, J.P.'s foster father testified that when J.P. was first placed with them, communication with him was difficult, and he had frequent, intense tantrums.[4] When asked to describe J.P. after he had been in their home for thirteen months, J.P.'s foster father testified,

> [J.P.] we call the best hugger in the house. He's always smiling. He's fun. He has a great time with his [foster] siblings. He has a great time playing outside.
>
> Since we can communicate with his speech, we are able to really work with him and he's really becoming his own.

It is clear to me, as it was to the circuit court, that for J.P.'s health and welfare, he should remain with his foster parents.

---

[4] The record indicates that J.P. participated in the Birth to Three Program. When he was first evaluated in August 2018, he had "at least a forty-percent delay in communication skills."

6

While I sympathize with the grandfather and understand his desire to raise his grandson, the decision regarding J.P.'s permanent placement should have been based upon the circumstances that existed at the time of the placement hearing, not at the time when the grandparent petitioners first sought custody of J.P. Although I believe that J.P. should be adopted by his foster parents, by no means do I think that the grandparent petitioners should have been excluded from J.P.'s life. Our law allows for continued visitation and communication between third parties and an adopted child so long as there is "mutual assent between [the] adoptive parent(s) and [the] third party" and such an agreement is made part of the final adoption order. Syl. Pt. 5, in part, *Murrell B. v. Clarence R.,* 242 W.Va. 358, 836 S.E.2d 9 (2019); *see also* W.Va. Code § 48-22-704(e) (2001). The record here indicates that J.P.'s foster parents were amenable to such an agreement with the petitioner grandparents, and, in fact, the circuit court ordered the parties to discuss the terms of such future visitations so that the agreement could be made a part of the final adoption order.[5]

If the majority had actually taken the time to carefully review the record in this case and then applied our long established law with respect to custody matters, it would have concluded, as I did, that the circuit court chose the best result for J.P.—adoption by

---

[5]The record submitted to this Court contains an agreement proposed by the foster parents that provided for visits between J.P and his grandparents at least seven times a year, two of which would have been overnight stays.

his foster parents and continued visitation and communication with his grandparents. Instead, the majority was so displeased with the DHHR's conduct that it ignored both the evidence in this case and the law. The majority simply decided it was going to punish the DHHR by ripping this young child from the only stable and secure home he has ever known.

I am extremely sad for J.P. that the majority has disregarded what is clearly in his best interests, and I am deeply troubled by the precedent that this decision creates. Accordingly, I respectfully dissent from the majority's opinion in this case.