# STATE OF WEST VIRGINIA
## SUPREME COURT OF APPEALS

*In re* **A.H. and G.H.**

**No. 23-669** (Fayette County CC-10-2021-JA-163 and CC-10-2021-JA-164)

**FILED**

**May 14, 2025**

released at 3:00 p.m.
C. CASEY FORBES, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

## MEMORANDUM DECISION

At the conclusion of the underlying abuse and neglect proceeding terminating the parents' parental rights, the Circuit Court of Fayette County conducted multiple hearings to determine the permanent placement of the children, A.H. and G.H.[1]  After careful and considered analysis of the record before it, the court concluded that the best interests of the children would be served by continued placement with the respondent foster parents J.S. and D.S., with a permanency plan of adoption by them, rather than placement with the petitioners, maternal grandmother K.K. and her husband S.H., thereby overcoming the preference for grandparent placement.  The petitioners challenge the court's permanency decision.  Upon consideration of the parties' written and oral arguments, the appendix record, and the applicable law, we find that this case presents no new or significant question of law and that the court committed no error.  Accordingly, a memorandum decision affirming the circuit court's order is appropriate.[2]

In November 2021, DHS filed a petition alleging abuse and neglect of siblings, G.H. and A.H., by their biological parents and seeking immediate custody of the children.  The allegations in the petition centered on the parents' substance abuse issues and domestic violence in the home.  DHS caseworkers also documented that "the home was cluttered with trash, clothes, purses, maggots inside the freezer, and animal feces on the couch and floors."  The children were removed

---

[1] The petitioners appear by counsel Amber R. Hinkle, the respondent foster parents appear by counsel Jamison T. Conrad, and counsel Susan Hill appears as the children's guardian ad litem.  The West Virginia Department of Human Services appears by Attorney General John B. McCuskey and Assistant Solicitor General Frankie Dame.  Because a new attorney general took office while this appeal was pending, his name has been substituted as counsel.

Additionally, pursuant to West Virginia Code § 5F-2-1a, the agency formerly known as the West Virginia Department of Health and Human Resources was terminated.  It is now three separate agencies:  the Department of Health Facilities, the Department of Health, and the Department of Human Services.  *See* W. Va. Code § 5F-1-2.  For purposes of abuse and neglect appeals, the agency is now the Department of Human Services ("DHS").  Finally, we use initials to identify the parties in abuse and neglect cases.  *See* W. Va. R. App. P. 40(e).

[2] *See* W. Va. R. App. P. 21(c).

from the home and placed in a therapeutic foster home. It is undisputed that DHS did not file a diligent search summary identifying relatives and fictive kin of the children.[3]

The circuit court later adjudicated the parents as abusing and neglecting A.H. and G.H. and received services that included assistance with achieving and maintaining sobriety. The mother received visitation with the children, and Petitioner K.K. traveled from her home in North Carolina to attend two or three of those visits. Meanwhile, the children were shuffled through several different placements, due primarily to their behavioral issues. After the mother relapsed, and because the father had been participating minimally at best, termination of the parents' parental rights became imminent. At that time, paternal relatives who served as a temporary placement contacted Respondents J.S. and D.S. about considering placement of the children. J.S. and D.S. were friends of those paternal relatives, and the paternal relatives knew that J.S., who had been the children's kindergarten teacher, was adored by the children. J.S. and D.S. were interested in placement, contacted DHS, and immediately began looking for a home that could accommodate the children.

In January 2023, the mother's counsel requested that DHS initiate a home study of Petitioners' North Carolina home pursuant to the Interstate Compact on the Placement of Children ("ICPC"). But due to a change in a system used by DHS, that request was mistakenly not processed. Also in January 2023, the circuit court ordered that the children, who by that time had been moved from the paternal relatives' home, be separated because they were fighting with one another in their foster home, and G.H.'s behavior presented a danger to other children in that placement. So G.H. was moved to a fifth placement while A.H. remained in her fourth. Then, after Respondents J.S. and D.S. purchased a new home at the end of February 2023, G.H. was placed with them on March 2, 2023. After a psychiatrist approved reuniting the children, A.H. was placed with Respondents J.S. and D.S. on April 18, 2023.

On April 3, 2023, Petitioners K.K. and S.H. moved to intervene and for placement of the children. In their motion, they stated that a home study had yet to be completed. The circuit court first granted them interested party status and directed DHS to work to complete their home study. After the parents voluntarily relinquished their parental rights to the children in May 2023, the court granted Petitioners' motion to intervene, and it granted them visitation with the children. The court also granted Respondents J.S. and D.S.'s motion to intervene.

The June 2023 home study report prepared by North Carolina's Rowan County Department of Social Services determined that Petitioners "meet the criteria for approval as a kinship placement." The report documented that Petitioner S.H., maternal grandmother's husband, "has some old criminal convictions," including trespass, a noise ordinance violation, shoplifting/concealment of goods, and driving while impaired, but the social worker who prepared the study noted that the driving while impaired conviction "is the least severe of all DWI charges" in North Carolina, it occurred "over ten years ago," and he had not been arrested since.

The caseworker who completed the home study also addressed concerns that had come to light involving the presence of Petitioner K.K.'s adult son, Z.H., in the home. Z.H. had been

---

[3] *See* W. Va. Code § 49-4-601a (2020).

previously convicted of attempted malicious wounding of a minor. Petitioner K.K. reported that her son moved out in approximately April 2023 (but he still received his mail at Petitioners' home), and the caseworker saw "no indication" that Z.H. was then living in the home. The report concluded that Petitioners "appear to care deeply for [the children], and they are making the children's wellbeing a priority. They appear to be capable of providing a loving, safe, and stable home for the children."

Leading into the permanency hearings, held on August 15, 2023, and September 1, 2023, the guardian ad litem and DHS recommended that the children remain placed with Respondents J.S. and D.S. permanently. At the permanency hearing, G.H., who was then eight years old, and A.H., who was then six, provided in-camera testimony, and both expressed a desire to remain with J.S. and D.S. Other witnesses who testified included Tonya Massie, a DHS employee assigned to this case since December 2022, Heather Lucas, a family treatment court coordinator who worked with the mother, Petitioners K.K. and S.H., Respondents J.S. and D.S., paternal members of the children's family, and two service providers who supervised visitation between Petitioners and the children.

Petitioner K.K. testified to seeing the children frequently until moving from West Virginia to North Carolina in 2020. She maintained that she requested placement of the children when they were removed in November 2021, and she testified that DHS failed to follow up with her after she offered to move back into a home she owns in West Virginia. Ms. Massie testified that, although she became involved in the case approximately one year after the petition was filed, she saw no indication in the file that Petitioner K.K. sought early placement of the children. Ms. Lucas had "quite a bit of contact" with Petitioner K.K. during the underlying proceedings and also did not recall Petitioner K.K. expressing an interest in placement. But Ms. Lucas recalled Petitioner K.K. struggling with "helping versus enabling" the mother and that "[t]here were times when [Petitioner K.K.] would try to find reasons for [the mother's] behavior."

Petitioner K.K. acknowledged that her adult son, Z.H., who was convicted of the felony offense of attempted malicious wounding, lived with her from October 2021—before the petition was filed—until "around" February 2023. She testified that Z.H.'s victim was his then-girlfriend's minor daughter,[4] but Petitioner K.K. does not believe that Z.H. committed the crime he pled guilty to committing. Rather, Petitioner K.K. insinuated, the allegation was manufactured by his then-girlfriend. Petitioner K.K. also testified to losing a son to a drug overdose, but she does not believe that he willingly ingested the drugs; rather, she believes he was drugged.

Petitioner K.K. also denied knowledge of issues within the parents' home. She testified that she visited the mother's home prior to the children's removal. When asked if anything stood out inside the home, Petitioner K.K. responded, "No, because she knew I was coming, so if she knew I was coming she could have cleaned her home or whatever." Petitioner K.K. also stated that she had no knowledge of domestic violence in the parents' home. Regarding the mother's drug abuse, Petitioner K.K. claimed to have learned that the drug use had been years' long only after the children were removed from the home: "I said [to Petitioner S.H.] can you believe that

---

[4] Abuse and neglect proceedings were also initiated against Z.H.

she actually had been doing drugs for three years and no one ever realized that she was doing drugs?"

Both the children's paternal great-aunt and paternal grandfather testified to suspecting drug abuse by the mother. The paternal grandfather also testified to informing Petitioner K.K. of his suspicion that both parents were abusing drugs approximately two weeks before the children were removed.[5] Petitioner K.K. reportedly told the paternal grandfather that "she didn't think so. She didn't see no signs of [drug abuse]." The paternal grandfather also stated that Petitioner K.K. "said she visited. She said [she] didn't see nothing wrong. The house was clean. The kids was clean." After learning of the children's removal, the paternal grandfather again contacted Petitioner K.K., and he said that "[t]he first thing she asked me [was] if I called to gloat."

There was a significant amount of evidence about the improvements in the children's behavior and relationship since their placement with Respondents J.S. and D.S. Respondent J.S. testified that when G.H. was placed with them, he said that he felt that prior placements wanted his sister but not him. So, in the six weeks that J.S. and D.S. had G.H. before A.H. was placed with them, they "spent a lot of time and made a lot of effort to let him know that [they] loved him and wanted him." Respondent J.S. testified that she believes this time with G.H. was "instrumental" in the ability of the siblings to be reunited, and she testified to positive changes in the siblings' relationship since their placement together in her home.

Ms. Massie testified that the children have made "a complete turnaround" and "have actually portrayed no behaviors." Ms. Massie explained that the children no longer argued with one another, "actually hug one another now," and have a "bond that I have never seen them have with anyone else." The paternal grandfather stated that "[t]he kids are totally different," Respondents J.S. and D.S. have "done an excellent job with them," and he has "never seen [the children] as happy." "I've just seen so much change for the better in them since they've had them," he continued. The paternal great-aunt echoed this sentiment, noting that "you can just see the love and how happy they are." Also, the paternal great-great-aunt, in whose home the children were temporarily placed earlier in the proceeding, testified that the children were progressing in Respondent J.S. and D.S.'s home.

There was also evidence of a bond between the children and Petitioners. Two providers who supervised visits between Petitioners and the children testified to observing "a really good bond" and to having no concerns regarding the visits or Petitioners generally. Ms. Massie also testified to a "loving relationship between the children and the grandmother." But because she saw "more interaction between the children in more of a bonding relationship with [Respondents J.S. and D.S.] than I have with the grandmother," and because the children's behavior and relationship with one another had improved since placement with Respondents J.S. and D.S., Ms. Massie recommended permanent placement with J.S. and D.S. Ms. Massie also expressed

---

[5] The paternal grandfather testified to contacting Child Protective Services ("CPS") two to three times due to the parents' drug abuse and the unhygienic condition of the children and home. The paternal great-aunt was aware of the paternal grandfather's calls to CPS, so she did not independently report the parents' drug abuse. Although CPS investigated following at least one of those referrals, no petition was filed at that time.

concerns that if the children reside with Petitioners, K.K.'s adult son, Z.H., or the children's mother will return to Petitioner K.K.'s home and "cause more danger to these children and more trauma to the children."

The paternal grandfather also asserted that he believes the children should remain with Respondents J.S. and D.S. because "[t]hey love them," and he noted that J.S. and D.S. are "making a real good effort" to involve all of the children's family. The paternal great-aunt also testified to the familial relationships nurtured by J.S. and D.S., and if removed from that environment, the paternal great-aunt testified that the children "would be very disappointed and not happy. I see how happy they are." Finally, the paternal great-great-aunt stated that J.S. and D.S. involve family with the children and that it is her belief that it is in the children's best interests to stay with J.S. and D.S.

In a seventeen-page order entered on October 18, 2023, the circuit court concluded that it was in the children's best interests to remain with Respondents J.S. and D.S. with a permanency plan of adoption by them. The court began by questioning whether Petitioner K.K. was a suitable placement while Z.H. resided in the home, and it found that she would not have passed a home study until February 2023 at the earliest due to his presence. The court also noted that the permanency plan throughout the underlying proceedings was reunification, so early placement of the children in North Carolina would have frustrated the mother's visitation with the children—a "critical part" of her improvement period. And, the court observed, Petitioner K.K. "never relocated to West Virginia to facilitate increased visitation or placement with her." Respondents, on the other hand, "bought a new house, and invested the time and money needed to get that house approved in a relatively short time."

The circuit court determined that Petitioners K.K. and S.H. sought permanent placement only once termination of the parents' parental rights was imminent—more than a year after the children were initially removed and after "numerous placement disruptions for both." The court found that Petitioner K.K. did not have "significant contacts with the children prior to the removal" and only "some visitation during 2022," after removal. By failing to intervene earlier, Petitioners "allowed the children to be placed with and settle in with [Respondents J.S. and D.S.] and increase the bond and relationship previously existing with [them] from their time together at the school." And although the home study showed that Petitioners' home was suitable, the court could not "discount the effect the passage of time has had on the children, nor the bonds and meaningful relationships that have been developed and cultivated during that time." The court found that the children's best interests would be served by preserving that relationship with Respondents J.S. and D.S., where the children "are in a safe, loving environment" and "developed a sense of safety and security after bouncing around from placement to placement." Another change in placement "alone would be a traumatic experience for the children, considering their wishes."[6]

The circuit court also expressed concern over Petitioner K.K.'s "ability to protect the children" by avoiding relationships with people who place the children at risk of abuse, including Z.H. and the parents. The court found that "the evidence showed that [Petitioner K.K.] lacked

_____
[6] Although the circuit court made note of the children's wishes, it found that their wishes were "not determinative given their ages."

awareness of the children's parents' substance abuse and abuse and neglect of the children. The evidence showed that she was made aware of these issues by other family members but failed to take any meaningful protective action for the children." Thus, the court explained that "[p]ermanent placement with [Respondents J.S. and D.S.] would provide the children with a continuity of caregivers and reduce the risk of the children being exposed to [Petitioner K.K.'s] son or the children's abusing biological father or mother."

Based on the entirety of the record, the circuit court concluded that the grandparent preference was "not enough" to justify permanent placement with Petitioners K.K. and S.H. Given the length of time the children have been placed with Respondents J.S. and D.S., the bond between them and the children, and the interest in preserving that bond, the court found that it would not be in the children's best interests to remove them from Respondents J.S. and D.S. Rather, the children's best interests would be served by remaining with Respondents J.S. and D.S. with placement for adoption, as "[a]fter having lived through this storm of chaos" resulting from their removal, multiple placements, and termination of their parents' rights, "these children have found respite, comfort, and security in [Respondents J.S. and D.S.'s] home."

Petitioners K.K. and S.H. appeal from the circuit court's October 18, 2023, order and challenge the court's permanency decision. "This Court reviews the circuit court's final order and ultimate disposition under an abuse of discretion standard. We review challenges to findings of fact under a clearly erroneous standard; conclusions of law are reviewed *de novo*."[7]

Petitioners K.K. and S.H. argue that the circuit court erred in finding that the proper permanent placement for the children is with Respondents J.S. and D.S. instead of them. They argue that "[b]ureaucratic delays are at the center" of this case, claiming to have requested placement of the children when they were removed and to have been in regular contact with DHS. They point to DHS's failure to file a diligent search summary as required by West Virginia Code § 49-4-601a and claim that DHS failed to timely initiate a home study, which then allowed the children to be transferred through various placements while a "suitable and willing" grandparent was known to DHS. Petitioners assert that the court "held against them" the fact that they did not know that they could be granted placement if they "uprooted their lives[] and moved back to West Virginia." Petitioners also state that they are appropriate and fit and have a close and loving bond with the children, so a permanency plan of adoption by them is in the children's best interests.

Preliminarily, we address the early delays alleged by Petitioners. West Virginia Code § 49-4-601a adopts "a preference for children to be placed with relatives or fictive kin when they are initially removed from the custody of their biological parents."[8] It provides, in relevant part, that

> [w]hen a child is removed from his or her home, placement preference is to be given to relatives or fictive kin of the child. If a child requires out-of-home care,

---

[7] Syl. Pt. 1, in part, *Napoleon S. v. Walker*, 217 W. Va. 254, 617 S.E.2d 801 (2005) (quoting Syl. Pt. 4, *Burgess v. Porterfield*, 196 W. Va. 178, 469 S.E.2d 114 (1996)).

[8] *In re G.G.*, 249 W. Va. 496, 504 n.10, 896 S.E.2d 662, 670 n.10 (2023).

6

placement of a child with a relative is the least restrictive alternative living arrangement. The department must diligently search for relatives of the child and fictive kin within the first days of a child's removal and must identify and provide notice of the child's need for a placement to relatives and fictive kin who are willing to act as a foster or kinship parent.[9]

In achieving that end, the statute requires DHS to, among other things, file a list of relatives and fictive kin of the children known to DHS, determine whether those relatives and fictive kin are "willing and able" to act as foster or kinship parents, and then file its determinations with the court.[10] We have said that "[t]he purpose of this statute is to provide notice to relatives or fictive kin who are willing to act as foster or kinship parents,"[11] so where that purpose is achieved, we have also found DHS's failure to comply with the statute to be harmless.[12]

In our prior case of *In re A.C.*, the children's grandfather alleged, and DHS conceded, that DHS failed to comply with West Virginia Code § 49-4-601a; the grandfather further contended that the failure allowed the circuit court to use the passage of time against him in denying him permanent placement.[13] Noting that the purpose of the statute is to provide notice, we observed that the grandfather was aware of the children's removal, retained counsel and intervened in the proceedings, and, "[c]rucially," fully participated in the permanency hearing.[14] And, the grandfather was not a placement option at the time of removal in any event because he lacked acceptable housing.[15] So, we determined that DHS's failure to comply with West Virginia Code § 49-4-601a was harmless.[16]

For many of these same reasons, DHS's failure to comply with West Virginia Code § 49-4-601a here was harmless. Petitioners acknowledge that they were aware of the children's removal and that following termination of the parents' rights, they obtained counsel and intervened. And, crucially, they fully participated in the permanency hearing below. Importantly,

---

[9] W. Va. Code § 49-4-601a (2020).

[10] *Id.*

[11] *In re A.C.*, No. 21-0470, 2022 WL 1440656, at *5 (W. Va. May 6, 2022) (memorandum decision).

[12] *See id.*

[13] *Id.*

[14] *Id.*

[15] *Id.*

[16] *Id.*

7

they were not "able"[17] to act as kinship parents at the time of initial removal due to the presence of Petitioner K.K.'s felon son in the home.

Furthermore, in the period between the children's initial removal and when Petitioners filed their motion to intervene, Petitioners had little contact with the children, choosing instead to take a "wait and see" approach we have previously discouraged. In *In re A.A.*,[18] the grandmother challenged the circuit court's permanent placement decision, in part because she claimed that the court erred in failing to order an immediate home study and then concluded that she was at fault for the delay in seeking custody of her grandchild.[19] On appeal, in rejecting that characterization of the proceedings, the Court noted that the grandmother "did not intervene in the proceedings to assert her right to custody at the outset. In fact, she explicitly declined to take custody, and then held off intervening for ten months to 'wait and see' if [the child's] father's parental rights were going to be terminated."[20] Immediately after granting the grandmother's motion to intervene, the court ordered a home study, and it was completed shortly thereafter.[21] As a result, we concluded that neither DHS nor the circuit court was at fault for the delay in completing the home study; instead, "the blame falls squarely on the [grandmother's] shoulders," and she was entitled to no relief.[22]

Here, in addition to Petitioners not being a placement option when the children were removed and continuing until at least February 2023, beyond the initial (but unprocessed) request for an ICPC home study, Petitioners failed to communicate to the circuit court that they desired placement of the children until moving to intervene almost a year and a half after the petition was filed. And rather than seek custody from the court earlier (or move to the home in West Virginia they already owned to facilitate earlier placement), Petitioners waited to see whether the parents' parental rights would be terminated, with Petitioner K.K. seeing the children only two or three times during the proceedings while the mother visited the children. As a result, we conclude that "bureaucratic delays are [not] at the center of" this case, but even if they were, decisions regarding permanent placement "ha[ve] to be made based upon the circumstances existing at *that* time, not when the petitioners contend that they first sought custody."[23] "[B]ureaucratic errors and delays cannot dictate the outcome of a case where a child's future is at stake."[24] This is because "the

---

[17] *See* W. Va. Code § 49-4-601a(4) (requiring DHS to file its determination of those relatives and fictive kin who are "willing and able to act as foster or kinship parents to the child").

[18] 246 W. Va. 596, 874 S.E.2d 708 (2022).

[19] *Id.* at 611, 874 S.E.2d at 723.

[20] *Id.* at 612, 874 S.E.2d at 724.

[21] *Id.*

[22] *Id.*

[23] *In re G.G.*, 249 W. Va. at 506, 896 S.E.2d at 672 (emphasis added).

[24] *Id.*

primary goal in cases involving abuse and neglect . . . must be the health and welfare of the children."[25]

Indeed—and moving to the remainder of Petitioners' arguments on appeal—the children's best interests "remain[] paramount"[26] even when, as here, the "grandparent preference in determining adoptive placement for a child where parental rights have been terminated"[27] is in play. West Virginia Code § 49-4-114, the grandparent preference statute, provides, in relevant part, that

> [f]or purposes of any placement of a child for adoption by the department, the department shall first consider the suitability and willingness of any known grandparent or grandparents to adopt the child. Once grandparents who are interested in adopting the child have been identified, the department shall conduct a home study evaluation, including home visits and individual interviews by a licensed social worker. If the department determines, based on the home study evaluation, that the grandparents would be suitable adoptive parents, it shall assure that the grandparents are offered the placement of the child prior to the consideration of any other prospective adoptive parents.[28]

We have discerned that this statute "incorporates a best interests analysis within that [adoptive placement] determination by including the requirement that the [DHS] find that the grandparents would be suitable adoptive parents prior to granting custody to the grandparents."[29] While the statute "contemplates that placement with grandparents is presumptively in the best interests of the child, and the preference for grandparent placement may be overcome only where the record reviewed in its entirety establishes that such placement is not in the best interests of the child,"[30] "[t]he grandparent preference must be considered in conjunction with our long standing jurisprudence that 'the primary goal in cases involving abuse and neglect . . . must be the health and welfare of the children.'"[31] And "[t]he preference is just that—a preference. It is not absolute."[32]

---

[25] *Id.* (quoting Syl. Pt. 3, in part, *In re Katie S.*, 198 W. Va. 79, 479 S.E.2d 589 (1996)).

[26] *In re K.E.*, 240 W. Va. 220, 225, 809 S.E.2d 531, 536 (2018).

[27] *Napoleon S.*, 217 W. Va. at 256, 617 S.E.2d at 803, Syl. Pt. 4, in part.

[28] *Id.* § 49-4-114(a)(3) (2023).

[29] *Napoleon S.*, 217 W. Va. at 256, 617 S.E.2d at 803, Syl. Pt. 4, in part.

[30] *Id.*

[31] *In re Hunter H.*, 227 W. Va. 699, 703, 715 S.E.2d 397, 401 (2011) (quoting *In re Katie S.*, 198 W. Va. at 82, 479 S.E.2d at 592, Syl. Pt. 3, in part).

[32] *In re K.E.*, 240 W. Va. at 225, 809 S.E.2d at 536.

Here, the circuit court's determination that the grandparent preference has been overcome and that it is in the children's best interests to remain with Respondents J.S. and D.S. with a plan of adoption by them is amply supported. The primary bases on which the court rested its best-interests determination were the effects the passage of time had on the children, the bonds and meaningful relationships developed during that time, and concerns for Petitioner K.K.'s ability to protect the children from inappropriate adults. While the children were bounced from placement to placement, they displayed problematic behaviors that culminated in their separation. But Petitioners K.K. and S.H. did almost nothing to foster their relationship with the children, nor did they intervene or otherwise position themselves for early placement to alleviate the children's transfers. Once placed in Respondents J.S. and D.S.'s care, though, nearly every witness testified at the permanency hearing that the children's behavioral issues resolved, their relationship vastly improved, and they developed an unparalleled bond. While there was evidence of a bond between Petitioners and the children, the evidence showed that the bond was greater between the children and Respondents J.S. and D.S., in whose care the court justifiably found the children "developed a sense of safety and security."

Similarly, the circuit court's concern that Petitioner K.K. will be unable to protect the children from inappropriate adults was well founded given her inability—or unwillingness—to identify risks to the children. She declined to believe that Z.H. committed a crime against a minor that he admitted committing, refused to believe that another son could have willingly ingested drugs, and harbored that same incredulity when it came to the mother's drug abuse, despite her drug abuse being obvious to others and the paternal grandfather informing Petitioner K.K. of the parents' drug abuse and neglect of the children. Petitioner K.K. failed to intercede to protect her grandchildren then, so the court reasonably concluded that she may fail to protect them now. Therefore, we find no error in the court's findings regarding the applicability of the grandparent preference or the children's best interests.

For the foregoing reasons, we affirm the circuit court's order determining that the appropriate permanency plan for the children is adoption by Respondents J.S. and D.S.

Affirmed.

**ISSUED:** May 14, 2025

**CONCURRED IN BY:**

Chief Justice William R. Wooton
Justice Elizabeth D. Walker
Justice Tim Armstead
Justice C. Haley Bunn
Justice Charles S. Trump IV