**STATE OF WEST VIRGINIA**
**SUPREME COURT OF APPEALS**

*In re* **A.J.**

**No. 21-0276** (Randolph County 19-JA-135)

## MEMORANDUM DECISION

Petitioner Intervenor and Grandmother C.N., by counsel Hilary M. Bright, appeals the Circuit Court of Randolph County's February 25, 2021, order denying her motion for permanent placement of A.J.[1] The West Virginia Department of Health and Human Resources ("DHHR"), by counsel Patrick Morrisey and Lee A. Niezgoda, filed a response in support of the circuit court's order. The guardian ad litem, Heather M. Weese, filed a response on the child's behalf in support of the circuit court's order. Intervenor foster parents S.F. and E.F., by counsel Melissa T. Roman, filed a response in support of the circuit court's order. On appeal, petitioner argues that the circuit court erred by denying her placement of the child.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

In October of 2019, the DHHR filed a child abuse and neglect petition alleging that the parents of then-one-year-old A.J. were addicted to controlled substances and homeless. The DHHR noted that petitioner (A.J.'s paternal grandmother) had filed a petition for guardianship of A.J. days earlier, and it was stayed due to the petition's filing. The DHHR was granted legal custody of the child, and it placed her with petitioner during the pendency of the proceedings. Throughout the proceedings, the parents were granted supervised visitation with A.J. provided that they submit to random drug screening and test negative for controlled substances. The

---

[1] Consistent with our long-standing practice in cases with sensitive facts, we use initials where necessary to protect the identities of those involved in this case. *See In re K.H.*, 235 W. Va. 254, 773 S.E.2d 20 (2015); *Melinda H. v. William R. II*, 230 W. Va. 731, 742 S.E.2d 419 (2013); *State v. Brandon B.*, 218 W. Va. 324, 624 S.E.2d 761 (2005); *State v. Edward Charles L.*, 183 W. Va. 641, 398 S.E.2d 123 (1990).

1

DHHR conducted a home study and approved petitioner's home in April of 2020, certifying her as a foster parent for A.J.

In May of 2020, the DHHR was notified that A.J. was seen in the unsupervised care of the father and his new girlfriend and that both adults were believed to be intoxicated at the time. The following day, petitioner admitted that she had allowed the father to take A.J. to see her (A.J.'s) paternal grandfather. The father also submitted for a random drug screen and tested positive for buprenorphine and alcohol. The DHHR removed A.J. from petitioner's home, and she was placed with foster parents S.F. and E.F.

Petitioner filed a motion to intervene in the proceedings in July of 2020, and requested custody of A.J. The foster parents also filed a motion to intervene, requesting permanent placement of the child. In October of 2020, both parents voluntarily relinquished their parental rights to A.J.

In December of 2020, the circuit court held a contested permanency hearing. The DHHR recommended that A.J. remain with her foster parents, S.F. and E.F. It presented the testimony of the child's maternal aunt, C.S., who testified that she witnessed the father and his girlfriend exercising unsupervised visitation with the child in May of 2020. C.S. testified that she saw the father at a gas station and, when she approached, saw the father attempting to hide A.J. in his truck. She testified that the father was "cussing" because he knew that she had seen the child, but C.S. assured the father that she would not tell anyone that he had the child. At that point, the father allowed C.S. to hold A.J. and talk to her for "five to ten minutes." C.S. testified that she believed the father and his girlfriend were under the influence of drugs when she met them. She explained that she had seen the father intoxicated numerous times and that she was an "ex-addict" and recognized the signs of intoxication, such as dilated pupils and rapid speech. C.S. also testified that she did not see a car seat for then two-year-old A.J. in the father's truck. Finally, the father and the girlfriend left the gas station. C.S. testified that she briefly followed their truck and observed A.J. sitting in the middle seat between the adults. After, C.S. called the DHHR and reported what she saw.

A DHHR worker testified that, in May of 2020, the father had not been participating in random drug screening for some time and, because of his noncompliance, was not permitted to have visitation with A.J. The DHHR worker testified that petitioner initially denied that she allowed the father to visit with A.J. unsupervised, but eventually admitted to the conduct. The worker asserted that petitioner admitted to other instances of unauthorized contact between the father and A.J. The DHHR worker stated that although petitioner's home study was approved by the DHHR and she met A.J.'s needs while the child was placed with her, the DHHR was concerned that petitioner would continue to allow the father to have contact with the child, despite his continued drug use. According to the DHHR worker, the father tested positive for alcohol and buprenorphine on the day after C.S. saw the father with the child. The DHHR presented testimony from a second case worker who testified that petitioner received parenting services as a condition of foster parent approval. The case worker testified that no additional services could be offered to improve petitioner's parenting because petitioner failed to protect the child from the father's drug abuse, despite the services she had already been provided.

Petitioner testified that she allowed the father to transport A.J. to the paternal grandfather's home because the grandfather was ill and requested to see the child. She further testified that she was aware of the father's long-term addiction and that permitting him to transport the child was in violation of the circuit court's orders, but she permitted the father to transport A.J. "out of the goodness of [her] heart but knowing it was wrong." Petitioner denied that A.J. traveled without a car seat, explaining that she transferred A.J.'s car seat from her vehicle into the father's truck and affixed it on the passenger side. Petitioner also testified that she had seen the father under the influence in the past and did not see any signs that he was under the influence on the day in question. The paternal grandfather and his partner, R.S., testified that they visited with A.J. and the father in May of 2020 and that they did not believe the father or his girlfriend were under the influence upon arriving with A.J. Petitioner denied that she allowed the father to visit A.J. on other occasions. She testified that she told the DHHR worker that she spoke to the father on the phone on occasion and that A.J. would yell a greeting to him but was not permitted to hold a conversation with him.

Dr. Timothy Saar testified that he performed a forensic psychological evaluation on A.J. regarding her attachment to the foster parents. Dr. Saar observed that A.J. was well bonded to the foster parents and referred to them as "mom" and "dad." He opined that A.J. was "attached" to her current foster parents and considered them her primary caregivers, which were critical factors for the psychological, social, and educational growth of a child. Dr. Saar further opined that it would be detrimental to A.J. to sever her attachment with the foster parents and foster brother and would put her at risk for mental health issues and social disorders. Dr. Saar clarified that his opinion did not diminish A.J.'s attachment to any other family member, such as petitioner, but reiterated that removing A.J. from her current placement could be detrimental to her development.

The circuit court heard testimony regarding petitioner's Christmas of 2020 visit with the child. The visitation supervisor noted that A.J. was initially hesitant during the visit, but not distressed when the foster mother left. A.J. was "cuddly" with petitioner as the visit neared its end. The supervisor observed that A.J. was not distressed when she departed petitioner's home. The foster mother testified that A.J. was "more clingy" with her and more defiant after the visitation and told the foster mother "don't you leave me ever again."

Ultimately, the circuit court found that it was in the child's best interests to remain with the foster parents and denied petitioner's motion for placement. The court first considered that "it was clear the child was permitted to accompany [the father and his girlfriend] unsupervised . . . and without prior drug screening," which was in violation of its prior orders. The court found that despite petitioner's testimony that she learned a hard lesson, "her actions were contrary to the best interests of [the child]" and the court was "not convinced" that she would act in the best interests of the child if permanency were awarded to her. The court further found that "there appear to be no remedial actions available to [e]nsure the best interests of [the child] are not . . . subordinated to the desires [of] petitioner or other family members [in the future]." The circuit court concluded that placement with petitioner was contrary to A.J.'s best interests. Finally, the

court reasoned that due to the attachment formed between A.J. and her foster parents, it was "further . . . convinced" that it was in the child's best interests to remain in their care. The circuit court's decision was memorialized in its February 25, 2021, order. Petitioner appeals that order.[2]

The Court has previously held:

> "Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety." Syl. Pt. 1, *In Interest of Tiffany Marie S.*, 196 W.Va. 223, 470 S.E.2d 177 (1996).

Syl. Pt. 1, *In re Cecil T.*, 228 W. Va. 89, 717 S.E.2d 873 (2011).

On appeal, petitioner argues that the circuit court erred in denying her placement of A.J. She asserts that the circuit court disregarded or misapplied West Virginia Code § 49-4-114(a)(3) and this Court's holdings on the "grandparent preference" and that placement of A.J. in her home was in the child's best interests.

We have previously discussed that West Virginia law sets forth a preference for adoption of a child by their grandparents if possible. *See* W. Va. Code § 49-4-114(a)(3).[3] "[West Virginia

---

[2]The parents voluntarily relinquished their parental rights to the child below. According to the parties, the permanency plan for the child is adoption by intervening foster parents, S.F. and E.F.

[3]For purposes of any placement of a child for adoption by the department, the department shall first consider the suitability and willingness of any known grandparent or grandparents to adopt the child. Once grandparents who are interested in adopting the child have been identified, the department shall conduct a home study evaluation, including home visits and individual interviews by a licensed social worker. If the department determines, based on the home study evaluation, that the grandparents would be suitable adoptive parents, it shall assure that the grandparents are offered the placement of the child prior to the consideration of any other prospective adoptive parents.

(continued . . . )

Code § 49-4-114(a)(3)] contemplates that placement with grandparents is presumptively in the best interests of the child, and the preference for grandparent placement may be overcome only where the record reviewed in its entirety establishes that such placement is not in the best interests of the child." Syl. Pt. 7, in part, *In re P.F.*, 243 W. Va. 569, 848 S.E.2d 826 (2020) (internal citation omitted). We have reiterated that the "grandparent preference" is not absolute and that placement must "be in the best interests of the child, given all circumstances of the case." *Id.* at 570, 848 S.E.2d at 827, Syl. Pt. 8, in part.

According to petitioner, the circuit court erred in determining that the record viewed in its entirety established that A.J.'s placement in her care was not in the child's best interests. Petitioner asserts that her single violation of the circuit court's order was not sufficient to make such a determination. She argues that the circuit court placed undue weight on C.S.'s testimony to establish that the father was under the influence while supervising A.J. and ignored substantial testimony from herself, the grandfather, and his girlfriend showing that the father did not appear under the influence on the day in question. Petitioner also argues that the circuit court failed to consider the compassionate circumstances of the violation (i.e. the grandfather's illness). Finally, petitioner argues that the circuit court erred in adopting the opinion of Dr. Saar due to his admission that he did not observe any interactions between petitioner and A.J. prior to forming his opinion.

At the outset, we note that, despite the conflicting witness testimony as to the father's sobriety on the day of the visitation, petitioner did not deny that she permitted this visitation, even while she "kn[e]w[] it was wrong." Petitioner testified that she was aware of the circuit court's requirement for the father to submit clean drug screens prior to visitations with the child and that she was aware that the father had failed to submit to his drug screening. Thus, petitioner knowingly exposed A.J. to the same conditions from which the child was removed—a caretaker engaging in substance abuse while supervising the child. While petitioner argues that the compassion behind her actions should be considered, she fails to comprehend the danger she placed the child in through her actions. Furthermore, she provided no reasonable explanation below as to why she allowed the father to transport the child rather than have the transportation occur by some other means.

The circuit court considered petitioner's testimony in total and concluded that "her actions were contrary to the best interests of [the child]," and it was "not convinced" that she would act in the best interest of the child if permanency were awarded to her. This credibility determination was well within the purview of the circuit court, and we decline to second guess that determination. *See Michael D.C. v. Wanda L.C.*, 201 W. Va. 381, 388, 497 S.E.2d 531, 538 (1997) ("A reviewing court cannot assess witness credibility through a record. The trier of fact is uniquely situated to make such determinations and this Court is not in a position to, and will not, second guess such determinations."). Similarly, the circuit court heard Dr. Saar's opinion regarding A.J.'s attachment to the foster parents, as well as his methodology for forming that opinion. In particular, the circuit court heard Dr. Saar's opinion that the foster parents served as

---

W. Va. Code § 49-4-114(a)(3).

A.J.'s primary attachment, regardless of the bond that petitioner and the child shared, and that severing that attachment could have detrimental effects. The circuit court properly weighed Dr. Saar's opinion and testimony, and we find no error in this regard.

Petitioner also argues that the circuit court erred in concluding that "there appear to be no remedial actions available" to correct her parenting and supervision of the child. She asserts that this Court suggested in *Napoleon S. v. Walker*, 217 W. Va. 254, 617 S.E.2d 801 (2005), that under circumstances like those presented in this case, additional remedial actions should be pursued in order to achieve placement with a grandparent. In *Napoleon S.*, the grandparents were denied placement because they "failed to acknowledge their son's involvement" in their grandson's physical injuries. *Id*. at 258, 617 S.E.2d at 805. Upon our review, we reasoned that "the evidence furnished concerning the [grandparents] . . . [did] not appear to provide a rational basis for the expressed fears of the committee" that the grandparents would not protect their grandson from contact with that child's abuser, their son. *Id*. at 262, 617 S.E.2d at 809. We noted that a psychologist who evaluated the grandparents found that they were "emotionally stable and would follow the directions of the court regarding the limitations of contact between [the child] and [his father]." *Id.*

While there are similarities between the facts of this case and *Napoleon S.* (positive home studies for example), there is a stark difference: In this case, petitioner had custody of A.J. for several months under the supervision of the DHHR and the circuit court. During that time, petitioner permitted the father, a substance abuser who refused to participate in random drug screening, to have unsupervised contact with the child, which was in direct contravention of the circuit court's orders. This is clear, affirmative evidence of petitioner's inability to follow the directions of the circuit court to prohibit contact between the father and A.J. The court, in this case, was informed in no uncertain terms that she had permitted this prohibited contact. Accordingly, we find the circuit court's finding that no remedial actions were available was more than reasonable, and we find no error in the circuit court's ultimate finding that placement in petitioner's custody was not in the child's best interests.

For the foregoing reasons, we find no error in the decision of the circuit court, and its February 25, 2021, order is hereby affirmed.

Affirmed.

**ISSUED**: October 13, 2021

**CONCURRED IN BY**:

Chief Justice Evan H. Jenkins
Justice Elizabeth D. Walker
Justice Tim Armstead
Justice John A. Hutchison
Justice William R. Wooton