IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2022 Term

_____

No. 21-0019

_____

FILED

**April 26, 2022**

released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

IN RE A.A.

_____

Appeals from the Circuit Court of Pleasants County
The Honorable Timothy L. Sweeney, Judge
Case No. 19-JA-21

AFFIRMED

_____

Submitted: January 4, 2022
Filed: April 26, 2022

John M. Butler, Esq.
Law Office of John M. Butler
St. Marys, West Virginia
Counsel for Petitioner B.M.


David C. White, Esq.
Law Office of Neiswonger and White
Moundsville, West Virginia
Guardian ad Litem for A.A.


Jessica E. Myers, Esq.
Myers Law Offices
Parkersburg, West Virginia
Counsel for Respondents K.V. and N.V.

Patrick Morrisey, Esq.
Attorney General
Andrea Nease Proper, Esq.
Assistant Attorney General
Charleston, West Virginia
Counsel for Respondent West Virginia
Department of Health and Human
Resources

JUSTICE WOOTON delivered the Opinion of the Court.

JUSTICE ALAN D. MOATS, sitting by temporary assignment, not participating.

SYLLABUS BY THE COURT

1.     "Where the issue on an appeal from the circuit court is clearly a question of law or involving an interpretation of a statute, we apply a *de novo* standard of review."  Syl. Pt. 1, *Chrystal R.M. v. Charlie A.L.*, 194 W. Va. 138, 459 S.E.2d 415 (1995).

2.     "'Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous.  A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.  However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety.'  Syl. Pt. 1, *In Interest of Tiffany Marie S.*, 196 W.Va. 223, 470 S.E.2d 177 (1996)."  Syl. Pt. 1, *In re Cecil T.*, 228 W. Va. 89, 717 S.E.2d 873 (2011).

3.     "The Uniform Child Custody Jurisdiction and Enforcement Act, West Virginia Code § 48-20-101, *et seq.*, is a jurisdictional statute, and the requirements of the statute must be met for a court to have the power to adjudicate child custody disputes."  Syl. Pt. 6, *Rosen v. Rosen*, 222 W. Va. 402, 664 S.E.2d 743 (2008).

i

4.     ""'Lack of jurisdiction may be raised for the first time in this court, when it appears on the face of the bill and proceedings, and it may be taken notice of by this court on its own motion." Syllabus Point 3, *Charleston Apartments Corp. v. Appalachian Elec. Power Co*., 118 W. Va. 694, 192 S.E. 294 (1937).' Syl. Pt. 3, *Lewis v. Munic. of Masontown*, 241 W. Va. 166, 820 S.E.2d 612 (2018)." Syl. Pt. 4, *In re Z.H*., 245 W. Va. 456, 859 S.E.2d 399 (2021).

5.     "All courts must be watchful for jurisdictional issues arising under the Uniform Child Custody Jurisdiction and Enforcement Act ("UCCJEA"), West Virginia Code §§ 48-20-101 to -404 (2001). Even if not raised by a party, if there is any question regarding a lack of subject matter jurisdiction under the UCCJEA then the court should sua sponte address the issue as early in the proceeding as possible." Syl. Pt. 5, *In re Z.H*., 245 W. Va. 456, 859 S.E.2d 399 (2021).

6.     "Pursuant to West Virginia Code § 48-20-102(g) (2001), 'home state' means the state in which the child lived with a parent or a person acting as a parent for at least six consecutive months immediately before the commencement of a child custody proceeding." Syl. Pt. 3, in part, *Rosen v. Rosen*, 222 W. Va. 402, 664 S.E.2d 743 (2008).

7.     "'To determine whether a state qualifies as a child's "home state" for purposes of determining initial jurisdiction under W. Va. Code § 48-20-201(a) (Repl. Vol. 2009), a court must analyze whether any state qualified as the child's "home state" at any

ii

time within the six months immediately preceding commencement of the action.' Syl. Pt. 3, *In re K.R.*, 229 W. Va. 733, 735 S.E.2d 882 (2012)." Syl. Pt. 6, *In re Z.H.*, 245 W. Va. 456, 859 S.E.2d 399 (2021).

8. "West Virginia Code § 49-3-1(a) [now § 49-4-114(a)(3)] provides for grandparent preference in determining adoptive placement for a child where parental rights have been terminated and also incorporates a best interests analysis within that determination by including the requirement that the DHHR find that the grandparents would be suitable adoptive parents prior to granting custody to the grandparents. The statute contemplates that placement with grandparents is presumptively in the best interests of the child, and the preference for grandparent placement may be overcome only where the record viewed in its entirely establishes that such placement is not in the best interests of the child." Syl. Pt. 4, *Napoleon S. v. Walker*, 217 W. Va. 254, 617 S.E.2d 801 (2005).

WOOTON, Justice:

In June 2019, Child Protective Services ("CPS") temporarily removed the minor child A.A.[1] from a hotel room in St. Marys, West Virginia, after her father, M.A., was arrested for unlawful possession of firearms. At the time of removal, CPS contacted A.A.'s paternal grandmother, Petitioner B.M. ("Petitioner"), to take custody of the child. Petitioner declined to take custody, so the DHHR placed A.A. with the Respondent Foster Parents, K.V. and N.V. ("Respondent Foster Parents"). Shortly thereafter, the West Virginia Department of Health and Human Resources ("DHHR") filed an abuse and neglect petition alleging that A.A. was found in the hotel room with an unrelated person, and that drugs and drug paraphernalia were also in the room. The petition further alleged that M.A. and the child's biological mother, D.A., were habitual drug users such that they could not care for the child. The petition indicated that A.A.'s last known residence was in South Carolina.

Ten months after the underlying proceedings began, Petitioner intervened in and filed a motion to transfer custody of A.A. to her, asserting the statutory grandparent preference. After an evidentiary hearing the circuit court denied that motion, finding that such a transfer would not be in A.A.'s best interest. Petitioner now appeals that order, asserting, among other things, that the circuit court lacked jurisdiction over the proceedings

_____

[1] Consistent with our long-standing practice in cases with sensitive facts, we use initials where necessary to protect the identities of those involved in this case. See *In re K.H.*, 235 W. Va. 254, 773 S.E.2d 20 (2015).

1

under the Uniform Child Custody Jurisdiction Enforcement Act ("UCCJEA"), West Virginia Code §§ 48-20-101 to -404 (2001). Because we find that the circuit court appropriately exercised jurisdiction in this matter, and because we find Petitioner's remaining assignments of error to be without merit, we affirm.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

The facts relevant to this appeal are somewhat complicated; we must necessarily examine matters that occurred before the inception of the underlying abuse and neglect matter in order to resolve the jurisdictional question raised. Therefore, to set out the facts in a manner most conducive to our analysis, we have divided this recitation into separate, chronological categories.

### A.  *Pre-Petition*

A.A. was born in Washington, Pennsylvania, in July 2015. Shortly after her birth she and the biological parents, M.A. and D.A., moved to New Martinsville, Wetzel County, West Virginia. The record contains little to no information about A.A.'s place of residence from the time she moved to New Martinsville until the filing of an abuse and neglect petition in Wetzel County on May 3, 2018 (the "2018 petition").

The 2018 petition alleged that A.A.'s mother, D.A., appeared at the New Martinsville Police Department in April 2018 while under the influence of controlled substances. A.A. was with her at the time. D.A. informed the police that A.A.'s father,

2

M.A., had kidnapped the child from Petitioner's home in New Jersey in March 2018.[2] The petition further alleged that: D.A. was homeless; M.A. was absent; both parents suffered from substance abuse issues; and there was no family to take custody of A.A. After a hearing, the Circuit Court of Wetzel County dismissed the 2018 petition on May 16, 2018, without explanation. There is nothing in the record establishing the reason for the dismissal, nor has an explanation been proffered by the parties to the instant appeal. That said, the parties make multiple allusions to Petitioner's conduct after the dismissal of the petition, and in particular that she transported the child back to New Jersey.

We can further glean from the record that A.A. returned to West Virginia at some point in the summer of 2018, as both Petitioner and the Respondent Foster Parents testified that A.A. was in the care of the Respondent Foster Parents for approximately two weeks ending in mid-August 2018 after M.A. left the child in their home.[3] After leaving the Respondent Foster Parents' home in August 2018, it is undisputed that A.A. traveled

---

[2] We note that there is nothing in the record which either substantiates these allegations or indicates that Petitioner, and not M.A., had legal custody of the child at this time.

[3] The testimony presented below indicates that M.A. was in a relationship with the Respondent Foster Parents' daughter, K.S., at the time, and that the two were engaged in the abuse of controlled substances

to Pennsylvania where she resided with M.A. and Petitioner until relocating to South Carolina at the beginning of February 2019.[4]

## B.    *Removal and the Filing of the Instant Petition*

On June 5, 2019, following a high-speed chase, M.A. was arrested in Ohio County, West Virginia, for unlawful possession of firearms. The same day A.A. was removed from a hotel room in St. Marys, Pleasants County, West Virginia. Evidence adduced below establishes that M.A. brought A.A. to West Virginia three days prior to her removal.

At the time of removal, A.A. was found in a hotel room with an unrelated adult woman, and it was determined that drugs and drug paraphernalia were present in the room. Beyond this, the facts become somewhat unclear, but we can glean from the record—largely based on Petitioner's testimony below—that when Child Protective Services ("CPS") arrived at the hotel room to remove A.A., the unrelated adult woman contacted Petitioner by telephone to inform her that M.A. had been arrested and that CPS was taking custody of the child. At some point during that conversation, the attending CPS

---

[4] We take care to note that, as discussed *infra*, Petitioner testified that she moved from Pennsylvania to South Carolina in February 2019, but she also separately testified that she only resided in Pennsylvania until January 2019. Specifically, she testified, "I got a house there [in Pennsylvania] and [M.A.] and [A.A.] came to my house there. [M.A.] was drug free and we stayed there *until January* when I was just there to finish up a job." (Emphasis added). Therefore, we can infer from the record that the relocation to South Carolina happened, at the latest, early in February 2019.

worker spoke to Petitioner and asked if she would take custody of A.A. It is undisputed that Petitioner declined to take custody of the child because she feared she would not pass a home study as her other adult son, a felon on parole, was living in her home. Petitioner then suggested CPS place A.A. with the Respondent Foster Parents as they had previously provided care for her.[5] Respondent Foster Mother also testified below that

> [Petitioner] asked if we could get her, get [A.A.]. We went and got [her] and at that point CPS was there. So CPS and [the unrelated woman] was there, the other girl in the hotel room. And [the unrelated woman] was on speaker phone. [Petitioner] was on the phone with her when we got there. They were all on the phone the whole time even when CPS brought [A.A.] to our home.

At this point, the CPS worker informed Petitioner that she should seek assistance from an attorney.[6]

Upon removing A.A. from the hotel room, the DHHR filed an application for ratification of the emergency removal in the Circuit Court of Pleasants County. That

---

[5] It appears from the record that the Respondent Foster Parents were identified as a relative/kinship placement for A.A. The parties disagree about how this notation came about, as the Respondent Foster Parents assert they did not hold themselves out to be relatives of the child. We note that the parties all testified at the permanency hearing in this matter that the Respondent Foster Parents are *not* related to A.A. by blood, marriage, or adoption.

[6] Petitioner further testified that she did not immediately seek legal assistance, but instead waited to see if M.A.'s and D.A.'s parental rights were terminated before becoming involved in the case.

application listed A.A.'s last known residence as an address in Anderson, South Carolina. The circuit court entered an order ratifying the removal on June 6, 2019.

On June 7, 2019, the DHHR filed the instant abuse and neglect petition (the "2019 petition") alleging as follows: (1) M.A. was arrested and incarcerated; (2) A.A. was located in a hotel room with an unrelated adult woman and suspected controlled substances and drug paraphernalia; (3) D.A.'s whereabouts were unknown; (4) both M.A. and D.A. were habitual users of illegal controlled substances; and (5) neither M.A. nor D.A. were presently able to provide care for A.A. Additionally, the 2019 petition alleged that "[a]t the time of the removal, the child [A.A.] resided with the respondent father at St. Marys Motel" in Pleasants County, but also that the child had at different times lived in Anderson, South Carolina, New Martinsville, West Virginia, and an unknown address in New Jersey.

## C. The Abuse and Neglect Proceedings

M.A. and D.A. waived their preliminary hearings on June 13, 2019. The circuit court then scheduled an adjudicatory hearing for July 24, 2019, but such hearing was continued multiple times. Ultimately, D.A. stipulated to the allegations raised in the 2019 petition, admitting that she engaged in the abuse of controlled substances to the extent that her parenting was impaired and she could not provide for A.A. Thereafter, the circuit court adjudicated D.A. an abusive and neglectful parent, and granted her a post-adjudicatory improvement period by order dated October 2, 2019. D.A. failed to participate in the terms of that improvement period insofar as she failed to submit to

6

random drug screening, so the circuit court proceeded to disposition with regard to her parental rights on November 9, 2019. The circuit court determined there was no reasonable likelihood the conditions of neglect or abuse could be substantially corrected in the near future as a result of D.A.'s unwillingness to comply with the terms of her improvement period, and thus terminated her parental rights by order dated December 10, 2019.

Throughout the proceedings, M.A. remained incarcerated. His adjudicatory hearing was held on December 16, 2019, and the circuit court entered an order adjudicating him an abusing and neglectful parent on February 13, 2020. The record does not contain a motion on the part of M.A. for a post-adjudicatory improvement period, nor does it appear the circuit court granted him one. Instead, the circuit court set the matter for disposition, and such disposition was repeatedly continued due to M.A.'s unavailability resulting from his multiple prison transfers. The dispositional hearing finally occurred on February 24, 2020, but the circuit court left the record open until March 5, 2020, so M.A. could file with the court his federal sentencing orders. The circuit court ultimately determined that M.A. was unable to correct the conditions of abuse and neglect in the foreseeable future, considering not only his incarceration, but also his inability to participate in an improvement period, his lengthy history of criminal behavior, and illegal drug use. As such, the circuit court terminated M.A.'s parental rights by order dated April 28, 2020.

7

***D.*** ***Petitioner's Intervention and Motion to Transfer Physical Custody***

On April 13, 2020, approximately two weeks before entry of the order terminating M.A.'s parental rights, Petitioner filed a motion to intervene in the proceedings. In her motion, she alleged that she was A.A.'s paternal grandmother and that it would be in the best interest of A.A. to grant the motion. Upon receiving no objection, the circuit court granted the motion on July 15, 2020. In the same order, the circuit court directed the DHHR to conduct a proper home study of Petitioner's residence to determine whether she would be a suitable placement for A.A.[7]

On August 5, 2020, before the home study took place, Petitioner filed a "Motion for Transfer of Physical Custody," seeking the transfer of A.A. from the Respondent Foster Parents to her. In the motion, Petitioner contended that A.A. "spent a majority of her time living with [Petitioner]" for the two years preceding the initiation of the 2019 abuse and neglect proceedings. Notably, Petitioner also contended that she sought placement of A.A., but that the DHHR "took no steps to do a home study or consider her as a placement even after termination of the parental rights." She further alleged that she had engaged in video visits with A.A. during the pendency of the case. Finally, she stated that she made arrangements to relocate to West Virginia from Georgia.

---

[7] It does not appear Petitioner resided in West Virginia at the time of the order; however, she did relocate to West Virginia from Georgia sometime in July or August 2020.

8

Thereafter, the circuit court set a hearing on Petitioner's motion for transfer of custody, stylized as a permanency hearing, for October 21, 2020. Respondent Foster Parents moved to intervene on October 5, 2020, and such motion was granted. A home study was conducted on Petitioner's home in Moundsville, West Virginia, on September 24, 2020, and flagged no safety concerns with the home.

At the October 21, 2020, hearing, the circuit court heard testimony from several witnesses, including Petitioner and the Respondent Foster Parents. While we need not recount all of the testimony presented, certain developments are pertinent to our analysis in this matter. Specifically, with regard to A.A.'s residences, Petitioner testified that A.A. originally moved to New Martinsville, West Virginia, with her biological parents shortly after her birth in 2015. She then testified that the child resided in New Jersey with her and M.A. for some time in the spring of 2018 before and after the 2018 abuse and neglect proceedings in Wetzel County. The Respondent Foster Mother testified that A.A. resided in her home for approximately two weeks in mid-August 2018. Petitioner confirmed this testimony and noted that, upon leaving the Respondent Foster Parents' home, A.A. stayed with Petitioner in Pennsylvania "until January [2019]."[8] Petitioner then testified she relocated from Pennsylvania to South Carolina in February 2019, and A.A.

[8] *See supra* note 4.

9

resided with her and M.A. in that home until M.A. took the child to West Virginia in June 2019.

Petitioner further testified that, during the pendency of the proceedings, she moved from South Carolina to Georgia, and ultimately to West Virginia. Notably, upon moving to West Virginia, Petitioner did not move to a community close to A.A. in Pleasants County, but instead moved to Moundsville, Marshall County, West Virginia, fifteen to thirty minutes from M.A.'s current address.[9] While Petitioner initially testified she wanted to relocate nearer to A.A., she also needed to move quickly to ensure the home study could be completed, so she had to take what housing was available. However, when pressed further about this by the circuit court, Petitioner conceded that she was unable to find an apartment in Pleasants County that would allow her to have pets, and that her animals were "part of [her] family[.]" Petitioner further responded in the affirmative when the court asked her, "You chose your dog and cat over your granddaughter, correct?"

Various witnesses also testified as to A.A.'s developmental delays and her improvements while in the Respondent Foster Parents' home. When A.A. was first removed from the hotel room in St. Marys, she was nonverbal and unable to use eating utensils, bathe or dress herself, or sit in a chair. Since the time of her placement with the Respondent Foster Parents, A.A. is now partially verbal, understands sign language, and

_____

[9] M.A. was released from incarceration on September 11, 2020, at which time he moved to Triadelphia, Ohio County, West Virginia.

10

can eat and bathe independently.  Further, she has been enrolled in a public school where she has an aide who accompanies her during the day.

Petitioner acknowledged these delays but debated their severity. Specifically, she asserted that A.A. would eat from a fork when the same was held by Petitioner.  She testified that when the child was in the home with her, she attempted to seek enrollment for A.A. in a specialized program for autistic children.  She noted that she had taken A.A. to a doctor in South Carolina to seek a recommendation for that program. Moreover, Petitioner presented conflicting testimony about the amount and consistency of care she provided to A.A. while the child was in her home.  Notably, Petitioner acknowledged that M.A. would take the child and leave sporadically, but that she would try to persuade him to leave the child with her.  It is unclear how frequently this occurred or how successful Petitioner was in persuading M.A. to leave the child in her care.

Additionally, the court heard testimony from one witness, K.S., that she witnessed Petitioner providing M.A. with an illegal substance.[10]  Finally, the guardian ad litem testified to his belief that it would be in the child's best interest to remain in her current placement with the Respondent Foster Parents because such placement had proven

---

[10] The circuit court found that by engaging in this conduct, Petitioner facilitated M.A.'s abuse of controlled substances.

beneficial to her development and afforded her the structure needed to ensure future improvement.

At the conclusion of the hearing, the circuit court indicated that it would deny Petitioner's motion to transfer custody—and, in fact, did so by order dated December 3, 2020. In reaching this conclusion, the circuit court noted several instances in which Petitioner had prioritized the interests of others over those of A.A., including: (1) declining placement of the child at the time of removal so her son, a paroled felon, could continue to reside in her home; (2) transporting A.A. to New Jersey after the 2018 abuse and neglect proceedings; (3) relocating closer to M.A., rather than A.A., when she moved to West Virginia; and (4) selecting an apartment that permitted her to have pets rather than moving closer to A.A. The circuit court also expressed its concerns that Petitioner would seek to "end run" around the proceedings and afford M.A. access to A.A. if granted custody, despite M.A.'s parental rights having been terminated.[11] The circuit court further noted that Petitioner did not attempt to assert her custodial rights until it was clear M.A.'s parental

---

[11] This finding, while supported by other evidence in the record, stems at least partially from the guardian ad litem having expressed concerns to the circuit court that Petitioner would merely take custody of A.A. and hand the child over to the father. The guardian founded his concerns not just on the case at bar, but circumstances arising from the 2018 petition in Wetzel County where he also served as the guardian ad litem. At the conclusion of the 2018 case, Petitioner transported A.A. from West Virginia to M.A. in New Jersey. As discussed further *infra*, while we do not have a complete record for the 2018 petition, we cannot definitively say that Petitioner's conduct at the conclusion of those proceedings was improper as M.A.'s parental rights remained intact at the conclusion of the proceedings.

12

rights would be terminated. Finally, the circuit court addressed the developmental delays A.A. suffered while allegedly in Petitioner's care and noted that such delays were markedly improving while A.A. was in the Respondent Foster Parents' care. Upon examining the foregoing testimony and comparing the two placement options, the circuit court ultimately found that it was in A.A.'s best interest to remain in her present placement with the Respondent Foster Parents and, thus, denied Petitioner's motion to transfer custody. Petitioner now appeals that order.

## II. STANDARD OF REVIEW

This matter involves a question of subject matter jurisdiction under the UCCJEA. We have held that "jurisdictional issues are questions of law[.]" *State ex rel. Universal Underwriters Ins. Co. v. Wilson*, 239 W. Va. 338, 343, 801 S.E.2d 216, 221 (2017)(citation omitted). "Where the issue on appeal from the circuit court is clearly a question of law or involving an interpretation of a statute, we apply a *de novo* standard of review." Syl. Pt. 1, *Chrystal R.M., v. Charlie A.L.*, 194 W. Va. 138, 459 S.E.2d 415 (1995).

Further, our general standard of review in abuse and neglect cases is as follows:

> "Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make the determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such a child is abused and neglected. These findings shall not be set aside by a reviewing court unless

13

clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety." Syl. Pt. 1, *In Interest of Tiffany Marie S.*, 196 W.Va. 223, 470 S.E.2d 177 (1996).

Syl. Pt. 1, *In re Cecil T.*, 228 W. Va. 89, 717 S.E.2d 873 (2011). With these standards in mind, we now proceed to address the parties' arguments on appeal.

## III. ANALYSIS

Petitioner raises multiple arguments. Specifically, she asserts that the circuit court: (1) lacked jurisdiction over the underlying abuse and neglect petition—and therefore her motion to transfer custody—under the UCCJEA; (2) erred in failing to name her as a party in the original proceedings because she was A.A.'s pre-petition custodian; (3) erred in failing to evaluate placement of A.A. in her home pursuant to the so-called "grandparent preference" in West Virginia Code § 49-4-114(a)(3) (2015); (4) improperly concluded Petitioner was at fault for the extensive delay in seeking custody of A.A.; (5) improperly admitted and relied upon the undisclosed testimony of a witness; (6) improperly concluded that transfer of the child to Petitioner's home would place undue stress on the child; and (7) erred in relying on speculative findings regarding whether Petitioner would permit the child's father to have access to her.

14

The DHHR, guardian ad litem, and Respondent Foster Parents filed response briefs arguing that all of Petitioner's assignments of error lack merit. For the reasons explained below, we agree with the collective respondents.

## A. Uniform Child Custody Jurisdiction and Enforcement Act

Petitioner first argues that the circuit court improperly exercised jurisdiction over the case sub judice in violation of the UCCJEA. Specifically, she contends that South Carolina has home state jurisdiction over the proceedings because A.A. resided in that state for six months.

We have previously recognized that the UCCJEA "is a model law adopted in West Virginia that governs subject matter jurisdictional issues for all child custody proceedings, including abuse and neglect proceedings." *In re Z.H.*, 245 W. Va. 456, 463, 859 S.E.2d 399, 406 (2021). In fact, West Virginia Code § 48-20-102(d) explicitly defines a "child custody proceeding" to include abuse and neglect matters. As a result, this Court has held that "[t]he [UCCJEA], West Virginia Code § 48-20-101, *et seq.*, is a jurisdictional statute, and the requirements of the statute must be met for a court to have the power to adjudicate child custody disputes." Syl. Pt. 6, *Rosen v. Rosen*, 222 W. Va. 402, 664 S.E.2d 743 (2008).

In the case at bar, Petitioner, despite having intervened below, did not argue before the circuit court that it lacked jurisdiction over these proceedings. Rather, she raises

this argument for the first time on appeal. In this regard, we have held that "[l]ack of jurisdiction may be raised for the first time in this court, when it appears on the face of the bill and proceedings, and it may be taken notice of by this court on its own motion." *Z.H.* 245 W. Va. at 459, 859 S.E.2d at 402, syl. pt. 3 (internal citations omitted). We explained in *Z.H.* that

> [a]lthough we will address the application of the UCCJEA in this appeal, we emphasize that the issue should have been taken up at the beginning of the circuit court proceeding. "The urgency of addressing problems regarding subject-matter jurisdiction cannot be understated because any decree made by a court lacking jurisdiction is void." *State ex rel. TermNet Merch. Servs., Inc. v. Jordan*, 217 W. Va. 696, 700, 619 S.E.2d 209, 213 (2005) (citation omitted).

245 W. Va. at 463-64, 859 S.E.2d at 406-07. Accordingly, while we address Petitioner's jurisdictional argument on appeal, we once again stress that the circuit court should have handled this at the outset of these proceedings, even if it had to do so sua sponte. For this reason, we once again caution that "[a]ll courts must be watchful for jurisdictional issues arising under the [UCCJEA] []. Even if not raised by a party, if there is *any question* regarding a lack of subject matter jurisdiction under the UCCJEA then the court should sua sponte address the issue as early in the proceeding as possible." *Id*. at 459, 859 S.E.2d at 402, syl. pt. 5 (emphasis added).

The UCCJEA, specifically West Virginia Code § 48-20-201(a) (2015), lists four bases for initial jurisdiction over child custody proceedings: (1) "home state" jurisdiction; (2) "significant connection" jurisdiction; (3) "declination" jurisdiction; and

16

(4) "default" jurisdiction. We have previously explained that these jurisdictional bases are listed in order of priority. *See In re K.R.*, 229 W. Va. 733, 740, 735 S.E.2d 882, 889 (2012). We address each of these in turn.

### a. *"Home State" Jurisdiction*

Petitioner contends that the circuit court could not exercise jurisdiction in this matter because the State of South Carolina had home state jurisdiction. In support of this contention, she asserts that the application for ratification of emergency custody and the initial abuse and neglect petition both list A.A.'s residence as an address in Anderson, South Carolina. It is true that the documents list this address, and while we are greatly troubled that the circuit court did not find it prudent in light of that fact to undertake a jurisdictional analysis, we do not believe that under the UCCJEA the mere listing of an out-of-state address is sufficient to thwart jurisdiction—or to confer jurisdiction on the state in which the address is located. Rather, a more thorough analysis is required to determine whether the child's residence at that out-of-state address is sufficient to satisfy any of the jurisdictional bases listed in West Virginia Code § 48-20-201(a). Because the circuit court did not undertake that analysis below, we do so now.

West Virginia Code § 48-20-201(a)(1) provides that West Virginia may exercise jurisdiction if West Virginia "is the home state of the child on the date of the commencement of the proceeding, or was the home state of the child within six months before the commencement of the proceeding, and the child is absent from this state but a

17

parent or person acting as a parent continues to live in this state[.]" We quoted this statute verbatim in a prior holding, wherein we explained that "'home state' means the state in which the child lived with a parent or a person acting as a parent for at least six consecutive months immediately before the commencement of a child custody proceeding.'" *Rosen*, 222 W. Va. at 404, 664 S.E.2d at 745, syl. pt. 3, in part. To this end, we have further clarified that "[t]o determine whether a state qualifies as a child's 'home state' for purposes of determining initial jurisdiction under W. Va. Code § 48-20-201(a) (Repl. Vol. 2009), a court must analyze whether *any state* qualified as the child's 'home state' at any time within the six months immediately preceding commencement of the action." *Z.H.*, 245 W. Va. at 459, 859 S.E.2d at 402, syl. pt. 6 (quoting *K.R.*, 229 W. Va. at 734, 735 S.E.2d at 883, syl. pt. 3) (emphasis added).

None of the parties argue that West Virginia is A.A.'s home state. Having reviewed the record, we believe such an argument would have been futile. A.A. has moved sporadically from state to state for much of her young life, having resided at various times in West Virginia, New Jersey, Pennsylvania, and South Carolina. There are large gaps in the record which do not allow us to determine whether A.A. ever lived in West Virginia long enough—six consecutive months—to establish home state jurisdiction, but she certainly did not do so in the six months preceding the commencement of this action. Therefore, in order for West Virginia to have properly exercised jurisdiction in this matter, it must have done so under one of the other three jurisdictional bases. However, before we

18

can move to those other bases, we must examine whether *any other state* could have properly exercised home state jurisdiction at the time these proceedings were commenced.

As noted above, Petitioner contends that South Carolina was A.A.'s home state because the child and her father allegedly resided in Petitioner's home in Anderson, South Carolina, for six months prior to the commencement of these proceedings. However, the record on appeal indicates that Petitioner is mistaken. At the hearing on her Motion to Transfer Physical Custody, Petitioner testified that she moved to South Carolina in February 2019. The abuse and neglect petition in this matter was filed on June 7, 2019. Depending on the date that Petitioner moved to South Carolina—and assuming A.A. resided with her from the beginning—A.A. lived in South Carolina for no more than four months. Under the plain language of West Virginia Code § 48-20-201(a)(1), in order for South Carolina to have home state jurisdiction, A.A. must have resided there for at least six consecutive months.[12] She did not, and Petitioner's argument on this point fails: South Carolina is unequivocally not A.A.'s home state.[13] Thus, the appendix record fails to support a conclusion that A.A. had a home state for purposes of jurisdiction under the UCCJEA. Therefore, our analysis turns to the next jurisdictional basis.

---

[12] South Carolina has adopted identical statutory language providing that a child must reside in the state for six, consecutive months before the state may become the child's "home state." S.C. Code Ann. § 63-15-330(a)(1) (2008).

[13] Though Petitioner does not argue that Pennsylvania or New Jersey was A.A.'s home state, the appendix record fails to support either state being the child's home state.

19

### b. *"Significant Connection" Jurisdiction*

West Virginia Code § 48-20-201(a)(2) provides that West Virginia may exercise "significant connection" jurisdiction if

> [a] court of another state does not have jurisdiction under [§ 48-20-201(a)(1)], or a court of the home state of the child has declined to exercise jurisdiction on the ground that [West Virginia] is the more appropriate forum under section 20-207 [§ 48-20-207] or 20-208 [§ 48-20-208], and:
>
> (A) The child and the child's parents, or the child and at least one parent or a person acting as a parent, have a significant connection with this state other than mere physical presence; and
>
> (B) Substantial evidence is available in this state concerning the child's care, protection, training and personal relationships.

*Id*.

This is a two-prong analysis. First, a court must determine that no other state can exercise "home state" jurisdiction under § 48-20-201(a)(1) or that a state having such jurisdiction has declined to exercise it. Second, under subparts (A) and (B) a court must examine whether the child and at least one parent have a connection to West Virginia other than physical presence, and whether substantial evidence is available in West Virginia regarding the child's care, protection, training and personal relationships. Having already determined that no state has home state jurisdiction under section 48-20-201(a)(1), we turn to the second part of the analysis.

As we recognized in *Z.H.*,

20

> "[t]he drafters of the model UCCJEA recognized that '[t]he jurisdictional determination [of significant connection jurisdiction] should be made by determining whether there is sufficient evidence in the State for the court to make an informed custody determination. That evidence might relate to the past as well as to the present or future.' UNIF. CHILD CUSTODY JURISDICTION AND ENFORCEMENT ACT, Cmt. 2 to § 201 (Nat'l Conf. of Comm'rs of Unif. State Laws 1997) (internal quotation marks omitted)."

245 W. Va. at 470, 859 S.E.2d at 413.

There is ample evidence to establish that A.A. and at least one (if not both) of her parents have a significant connection to the State of West Virginia. Specifically, the record indicates that A.A. has lived sporadically in this state on several occasions, including shortly after her birth prior to an earlier abuse and neglect proceeding in Wetzel County in early 2018, and for a period of time in which she resided with the Respondent Foster Parents in the summer of 2018 *before* these proceedings began. A.A.'s biological mother, D.A., consistently resided in the state, and—though the record is largely undeveloped on this point aside from the 2018 abuse and neglect petition—had A. A. with her for some unknown amount of time until approximately one month prior to the filing of that petition. Moreover, on more than one occasion A.A. was brought to West Virginia for apparently extended periods while M.A. engaged in illicit behaviors. It was during one of those periods that A.A. first resided with the Respondent Foster Parents, when M.A. left her in their care for two weeks.

21

Beyond this, the record contains evidence regarding A.A.'s care, protection, training and personal relationships in West Virginia, while the record reveals little evidence relating to those factors in any other state. Beginning with the instant proceeding, all of the evidence regarding A.A.'s travel to and removal from the hotel room in St. Marys is available in West Virginia. In fact, all of the relevant information relating to this abuse and neglect proceeding—from both parents' alleged substance abuse to M.A.'s illegal conduct and having left A.A. with a totally unrelated person in a hotel room—is only available in West Virginia. Moreover, the same would likely have been true for the 2018 abuse and neglect matter in Wetzel County, as the evidence that would have supported that petition was primarily, if not solely, available in West Virginia (*e.g.*, the parents' substance abuse and D.A.'s inability to maintain appropriate housing and provide for the child at that time). Each of these go directly to the question of A.A.'s care and protection. Even outside of the abuse and neglect proceedings, there is additional evidence available in this State regarding A.A.'s care and personal relationships, including evidence of A.A.'s time residing with the Respondent Foster Parents in 2018. It is undeniable that the child had established significant relationships in this State prior to the institution of these proceeding**s;** Petitioner herself *recommended* that the Respondent Foster Parents take custody of the child the night she was removed from the hotel room.

The record is sparse with regard to A.A. and her parents' connections to any other state. To the extent that A.A. and M.A. have any significant connection to any other state, the record reveals that it pales in comparison to the connections they have to the State

22

of West Virginia. Accordingly, we conclude that A.A. and both of her parents have a significant connection to West Virginia, such that the courts of this state may properly exercise jurisdiction over custody matters concerning A.A pursuant to W. Va. Code § 48-20-201(a)(2).

Having determined that the circuit court properly exercised "significant connection" jurisdiction over this matter,[14] we conclude that Petitioner's first assignment of error—that the circuit court lacked jurisdiction over these proceedings—is without merit.

## B. Failure to Name Petitioner as a Party

Petitioner next argues that the circuit court erred insofar as it failed to name her as a party from the outset of these proceedings because she was, allegedly, A.A.'s

---

[14] Having determined the circuit court properly exercised significant connection jurisdiction over this matter, we need not address the remaining jurisdictional bases under the UCCJEA. That said, upon review it is apparent that "declination" jurisdiction under West Virginia Code § 48-20-201(a)(3) would not have been applicable here, as no other state had either home state jurisdiction or significant connection jurisdiction to decline. Further, given that no other state had proper jurisdiction under any of these three bases, and assuming, arguendo, West Virginia did not have proper significant connection jurisdiction pursuant to West Virginia Code § 48-20-201(a)(2), then West Virginia could have properly exercised "default" jurisdiction under West Virginia Code § 48-20-201(a)(4). That statute provides that the courts of this state may exercise jurisdiction if "[n]o court of any other state would have jurisdiction under the criteria specified in subdivision (1), (2), or (3)" of § 48-20-201(a)." *Id.* As explained, a thorough review of the record before us on appeal indicates that no court in any other state would have had jurisdiction under any of the aforementioned subdivisions.

23

custodian prior the initiation of this abuse and neglect action. Petitioner derives this from

West Virginia Code § 49-4-601(b) (Supp. 2021) which states, in relevant part, that

> [e]ach petition shall name as a party each parent, guardian, custodian, other person standing in loco parentis of or to the child allegedly neglected or abused and state with specificity whether each parent, guardian, custodian, or person standing in loco parentis is alleged to have abused or neglected the child.

West Virginia Code § 49-1-204 defines "custodian" as "a person who has or shares actual

physical possession or care and custody of a child, regardless of whether that person has

been granted custody of the child by any contract or agreement." Petitioner contends that

she was A.A.'s custodian because the child lived in her home and she provided care for the

child. The DHHR counters that Petitioner is not a "custodian" but a "caregiver," which

West Virginia Code § 49-1-204 defines as:

> [A]ny person who is at least eighteen years of age and:
>
> (A) Is related by blood, marriage or adoption to the minor, but who is not the legal custodian or guardian of the minor; or
>
> (B) Has resided with the minor *continuously* during the immediately preceding period of six months or more.

(Emphasis added).

 

From the evidence presented below, Petitioner provided precious little

evidence to the circuit court regarding A.A.'s time living with her or the care she provided

A.A.. In fact, the bulk of the testimony below indicates that A.A. *sporadically* lived with

Petitioner and did so only when A.A.'s father lived with Petitioner. There is even testimony

that A.A.'s father would leave with A.A. at times, as he did in the summer of 2018 when

24

A.A. resided for the first time with Respondent Foster Parents, and as he did three days prior to the institution of these proceedings when he brought the child to West Virginia. Moreover, the only evidence Petitioner proffered regarding her provision of care to A.A. is a somewhat vague reference to having attempted find her a school for children with special needs. Ultimately, while Petitioner may have provided some care to A.A., the appendix record fails to support that she "shared actual physical possession or care and custody" of A.A. as contemplated by the definition of "custodian" in West Virginia Code § 49-1-204. Accordingly, we agree with the DHHR that Petitioner more readily meets the definition of "caregiver" as she was over the age of eighteen, related to the child by blood, and was not the child's legal custodian. To that end, West Virginia Code § 49-4-601(b) does not require "caregivers" to be named as parties to abuse and neglect proceedings. Therefore, the circuit court did not err in failing to name her as a party to these proceedings.

### C. *Introduction of Undisclosed Testimony*

Petitioner next argues that the circuit court erred in admitting and relying on the undisclosed testimony of a witness. The witness in question is K.S.,[15] an acquaintance of M.A, who testified that she once observed Petitioner providing M.A. with methamphetamine. Petitioner asserts that this testimony was designed to ambush her at the hearing and that the content of said testimony was not properly disclosed under Rule 30 of the Rules of Procedure of Child Abuse and Neglect Proceedings, which provides:

---

[15] K.S. is also the adult biological daughter of the Respondent Foster Parents.

25

> At least five (5) judicial days prior to the *disposition hearing*, each party shall provide the other parties, persons entitled to notice and the right to be heard, and the court a list of possible witnesses, with a brief summary of the testimony to be presented at the disposition hearing, and a list of issues of law and fact. Parties shall have a continuing obligation to update information until the time of the disposition hearing.

(Emphasis added.) By its terms, this rule explicitly attaches only to dispositional hearings, which are defined in Rule 3(i) as "the hearing contemplated by W. Va. Code § 49-4-604 that is held after a child has been adjudged to be abused and/or neglected, at which the court reviews the child and family case plan filed by the Department and determines the appropriate disposition of the case and permanency plan for the family[.]" W. Va. R. P. Child Abuse & Neglect Proc. 3(i). The hearing on Petitioner's motion to transfer custody is not a dispositional hearing, but more akin to a "permanency hearing." *Id*. at 3(h) (defined as "the hearing contemplated by W. Va. Code § 49-4-608 to determine the permanency plan for the child."); *see also* W. Va. Code 49-4-608 (permanency hearing is to determine the appropriate permanent placement and plan for the child); W. Va. R. P. Child Abuse & Neglect Proc. 36a (same). As such, Rule 30 does not apply.

When counsel for Petitioner objected to the introduction of K.S.'s testimony at the underlying hearing, the circuit court stated that it directed that witness disclosures

> "be made pursuant to the [R]ules. In reviewing the rules, Rule 10 of the West Virginia Rules of Procedure for Child Abuse and Neglect [provides] the disclosure with regard to witnesses is limited to a written list of names and addresses of the witnesses the respondent intends to call in the presentation of the case in chief."

26

The circuit court found that there was no error in failing to disclose the intended content of K.S.'s testimony. We agree.

Rule 10 of the Rules of Procedure for Child Abuse and Neglect Proceedings sets out the general discovery rules for abuse and neglect proceedings. Moreover, it provides that "[t]he disclosure provided for in this rule is not intended to limit the amount or nature of disclosure in these cases. This rule merely establishes the *minimum amount of disclosure required.*" *Id*. at 10(d). To the extent that this was not a "disposition hearing" as contemplated by Rule 30 and subject to its additional discovery requirements, the general discovery requirements of Rule 10 applied. Rule 10 requires only that one disclose "[a] written list of names and addresses of all witnesses whom the attorney for the petitioner intends to call in the presentation of the case-in-chief, together with any record of prior convictions of any such witnesses." *Id*. at 10(b)(5). It also requires the respondent to disclose "[a] written list of names and addresses of the witnesses the respondent intends to call in the presentation of the case-in-chief." *Id*. at 10(c)(3). There is no requirement under Rule 10 to disclose a brief summary of the intended testimony of the witness.

It is undisputed that the DHHR disclosed the name and address of K.S. prior to the hearing on Petitioner's motion. Under Rule 10, the DHHR was not required to disclose a brief summary of K.S.'s intended testimony. As such, the circuit court did not err in admitting K.S.'s testimony or in relying upon it—to the extent it may have done so— in ruling upon Petitioner's motion.

27

### D. *Placement of the Child*

The remainder of Petitioner's assignments of error challenge the circuit court's findings with regard to its ultimate decision not to transfer custody of A.A. to Petitioner, and are predicated upon an alleged misapplication of the so-called "grandparent preference" enumerated in West Virginia Code § 49-4-114(a)(3). We will address these alleged errors collectively.

West Virginia Code § 49-4-114(a)(3) provides:

> For purposes of any placement of a child for adoption by the department, the department shall first consider the suitability and willingness of any known grandparent or grandparents to adopt the child. Once grandparents who are interested in adopting the child have been identified, the department shall conduct a home study evaluation, including home visits and individual interviews by a licensed social worker. If the department determines, based on the home study evaluation, that the grandparents would be suitable adoptive parents, it shall assure that the grandparents are offered the placement of the child prior to the consideration of any other prospective adoptive parents.

We have explained that this section "contemplates that placement with grandparents is presumptively in the best interests of the child, and the preference for grandparent placement may be overcome only where the record viewed in its entirety establishes that such placement is not in the best interests of the child." Syl. Pt. 4, in part, *Napoleon S. v. Walker*, 217 W. Va. 254, 617 S.E.2d 801 (2005). Further, we have emphasized that "[t]he grandparent preference must be considered in conjunction with [this Court's] long standing jurisprudence that 'the primary goal in cases involving abuse and neglect . . . must be the

28

health and welfare of the children.'" *In re Hunter H*., 227 W. Va. 699, 703, 715 S.E.2d 397, 401 (2011) (quoting Syl. Pt. 3, in part, *In re Katie S*., 198 W. Va. 79, 479 S.E.2d 589 (1996)).

Petitioner first asserts two intertwined arguments: (1) the court erred in failing to order an immediate home study of her place of residence despite being a suitable grandparent available for placement of the child; and (2) the court erred in concluding that Petitioner was at fault for the delay in the seeking custody of A.A.

As a preliminary matter, we reiterate that section 49-4-114(a)(3) requires circuit courts to make a threshold determination as to "suitability and *willingness* of any known grandparent" to take custody of A.A. (Emphasis added). Petitioner initially declined placement of A.A. at the time of removal. Testimony presented below from Petitioner and Respondent Foster Mother confirm that Petitioner was notified of the removal *as it was in progress* and explicitly declined to take custody of A.A. believing she would not pass a home study because her other son, a felon on parole, was residing in her home at the time. Moreover, the record indicates that Petitioner asked the Respondent Foster Parents to take custody of A.A. at that time. These facts clearly demonstrate that Petitioner was not a *willing* placement for A.A. at the beginning of these proceedings. Further, Petitioner did not later indicate to the circuit court that she was a willing placement until she moved to intervene in April 2020, some ten months after the proceedings began. As such, under the plain language of the statute, the circuit court was under no obligation

29

to order a home study of Petitioner's place of residence because she was not a willing placement for the child.

Later, after Petitioner intervened, she requested the circuit court to order a home study of her new residence in Moundsville. The court did so immediately upon granting her motion to intervene, and the home study was completed approximately one month later. Still, Petitioner contends that this delay was unreasonable and that the circuit court erroneously determined she was at fault for the delay. In making this argument, Petitioner likens this case to *In re J.P.*, 243 W. Va. 394, 844 S.E.2d 165 (2020), wherein this Court reversed and remanded a circuit court's order placing a child with foster parents rather than a suitable grandparent. However, *J.P.* is distinguishable from the case at bar because, in that case, we noted that the delay in performing a home study on the grandparent's home was attributable to the DHHR. *Id*. at 402, 844 S.E.2d at 173. There, the grandparents intervened at the very beginning of the case to assert their right to custody, but the home study wasn't completed for over a year. *Id*. The DHHR relied on that delay to place the child with the foster parents, but we reversed upon finding that the DHHR was at fault for the delay in completing the home study. *Id*. at 404, 844 S.E.2d at 175.

This case is the inverse of *J.P.*. Petitioner did not intervene in the proceedings to assert her right to custody at the outset. In fact, she explicitly declined to take custody, and then held off intervening for ten months to "wait and see" if A.A.'s father's parental rights were going to be terminated. Further, when she did ultimately

30

intervene, the home study was completed in a timely manner. Simply put, neither the DHHR nor the circuit court are at fault for the "delay" in completing this home study; the blame falls squarely on the shoulders of Petitioner and she is therefore entitled to no relief in this regard.[16]

Petitioner next asserts that the circuit court erred in finding that transferring custody of A.A. to Petitioner was not in the child's best interest because such a transfer would place undue stress on A.A., and because it had reason to believe Petitioner would permit A.A.'s father—whose rights have been terminated—to have access to the child. Upon review, we readily determine that the circuit court did not err in making either of these findings.

With regard to the undue stress A.A. would suffer upon a custodial transfer, the circuit court made multiple relevant findings. Specifically, it found that A.A. suffers from an extreme form of autism which renders her largely nonverbal and that when she was in Petitioner's care her autistic behaviors worsened due to a lack of therapeutic intervention. The court also found that placement in Petitioner's home would expose A.A. to individuals with felony convictions, criminal propensities, and related behaviors; this

---

[16] To the extent Petitioner also argues that the home study was insufficient because it did not include an "analysis by the [DHHR] and circuit courts of the best interests of the child, given all circumstances of the case" per our holding in syllabus point three of *J.P.*, we find no error. *See* 242 W. Va. at 294, 844 S.E.2d at 165. The circuit court performed a thorough best interests analysis in this case and considered the home study in so doing.

finding stems from Petitioner's repeated interactions with her children who are all convicted felons, including her prioritization of her parolee son's residence in her home at the outset of these proceedings. Perhaps most importantly, the court found that Petitioner, upon moving to West Virginia, moved to a community remote from A.A.'s current place of residence which would require the child to transition to a new home, new school, and new community. This is particularly relevant because A.A.'s severe autistic behaviors have substantially lessened with the routine afforded by her placement with the Respondent Foster Parents where she is enrolled in a specialized education program.[17] Having reviewed the record in its entirety, the circuit court did not err in its determination that transitioning A.A. to Petitioner's home was not in the child's best interest.

We turn finally to the circuit court's finding that Petitioner would likely facilitate contact between A.A. and her biological father. Petitioner contends that this finding is erroneous insofar as it is speculative. Petitioner apparently takes issue with the concerns raised by the guardian ad litem below that Petitioner was attempting an "end run" around the proceedings in that she would seek custody of the child just to turn her over to M.A. whose rights were terminated. In expressing these concerns, the guardian relied upon

---

[17] The circuit court, citing *In Interest of Carlita B*., 185 W. Va. 613, 623, 408 S.E.2d 365, 375 (1991), noted that this Court has previously emphasized the importance of "continuity of relationships, surroundings, and environmental influence" during a child's first three years of life. The circuit court reasoned that, although A.A. is chronologically more than three years old, due to her severe autism, "developmentally she is more likened to a toddler" such that the court was compelled to consider the bond and attachment she had with Respondent Foster Parents.

32

his previous interactions with Petitioner during the 2018 abuse and neglect matter in Wetzel County, specifically highlighting that at the close of those proceedings Petitioner transported A.A. to New Jersey to be with M.A. We take care to note that it does not appear Petitioner's conduct at that time was inappropriate, as M.A.'s parental rights had not been terminated. In fact, the Wetzel County matter was dismissed before reaching the adjudicatory phase, therefore there was nothing objectively improper about Petitioner's taking the child to M.A.

That said, the circuit court had additional evidence before it upon which to make the present determination that, if given custody of A.A, Petitioner was likely to facilitate contact between the child and M.A. Of note, the circuit court found it troubling that Petitioner specifically waited until it was apparent M.A.'s parental rights would be terminated before attempting to seek custody of A.A. Moreover, the court noted that Petitioner pointedly relocated to Moundsville, West Virginia, fifteen to thirty minutes from her son's residence in Triadelphia, West Virginia, rather than to a location closer to A.A in Pleasants County.

Both of these considerations were appropriate given several similar holdings from this Court. *See In re K.E.*, 240 W. Va. 220, 809 S.E.2d 531 (2018) (reversing a circuit court order which placed children with their grandparents when the grandparents lived two doors down from the parents whose rights had been terminated, and where there was evidence the parents had unfettered access to the children); *In re Elizabeth F.*, 225 W. Va.

780, 696 S.E.2d 296 (2010) (reversing an order placing a child with her grandparents where the grandmother refused to shield the child from the "negative influences" of her adult children); *In re T.R.*, 2016 WL 3165801, No. 15-1235 (2016) (memorandum decision) (affirming a circuit court order which refused to place the children with their grandparents who lived in the same "family compound" as the mother whose rights had been terminated); *In re K.C.*, 2019 WL 480160, No. 18-0242 (2019) (memorandum decision) (declining to disturb a child's placement with foster parents where the maternal grandparents undertook multiple efforts to "manipulate matters in favor of their daughter" including failing to complete a home study in an effort to delay the proceedings and initially refusing to take custody of a child born during the proceedings and where there was a "strong possibility that the mother would be allowed by the grandparents to move back into the home to help care for [the child][.]").

In short, in determining whether placement of a child with his or her grandparents is appropriate, this Court has long permitted lower courts to examine whether those grandparents may facilitate contact between the child and a parent whose rights have been terminated. Here, the circuit court had ample reason to believe Petitioner may permit M.A. to have access to A.A., not the least of which was her decision to move substantially closer to him than to A.A. during the proceedings. Beyond this, it is clear that, even assuming Petitioner did not permit M.A. to have contact with A.A., the child would still be subject to the "negative influences" of Petitioner's other adult children, having already demonstrated her willingness to prioritize them over A.A. by declining to take custody of

34

A.A. in favor of her parolee son to reside in her home. To be clear, we are not stating that grandparents must necessarily choose between their adult children and their infant grandchildren, but we stress that the ultimate question for a circuit court in abuse and neglect matters is what is in the best interest of the child. To the extent the circuit court considered evidence that Petitioner would facilitate contact between A.A. and her biological father, or that the child would be exposed to continuing negative influences in Petitioner's home, it was justified in determining that it would not be in A.A.'s best interest to place the child with Petitioner.

Therefore, we find no error in the circuit court's findings related to the application of the grandparent preference embodied in West Virginia Code § 49-4-114(a)(3), the delay in the home study on Petitioner's residence, or the findings regarding A.A.'s best interests.

## IV. CONCLUSION

For the foregoing reasons, we affirm the Circuit Court of Pleasants County's December 3, 2020, Order denying Petitioner's Motion to Transfer Physical Custody.

Affirmed.